**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| TRIUMPH PACKAGING GROUP, an Illinois corporation, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 11-cv-7927 |
| v. | ) ) | |
| SCOTT WARD, VITAL-X ASSOCIATES, LLC, an Illinois limited liability corporation, CREATIVE DESIGN PRODUCTS, INC., JOHN DOES, JANE DOES AND ABC COMPANIES, | ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Before the Court is Plaintiff Triumph Packaging Group's ("Triumph") motion for a preliminary injunction. For the following reasons, the Court denies Triumph's motion.

## PROCEDURAL HISTORY

On November 8, 2011, Triumph filed a seven-count Complaint against Defendants Scott Ward, Vital-X Associates, LLC ("Vital-X"), Creative Design Products, Inc. ("CDP"), John Does, Jane Does and ABC Companies (collectively, "Defendants"), alleging the following claims: 1) actual and threatened misappropriation of trade secrets in violation of the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065/1, *et seq.* against Defendant Ward; 2) violation of the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* against all Defendants; 3) breach of fiduciary duty against Defendant Ward; 4) tortious interference with existing and prospective economic advantage against Defendants Ward, Vital-X and CDP; 5) civil conspiracy against all Defendants; 6) breach of contract against Defendant Ward; and

7) conversion against all Defendants. (R-1, Compl.)

On the same date, Triumph brought an emergency motion for a temporary restraining order and preliminary injunctive relief, seeking to enjoin Defendant Ward from, among other things, misappropriating Triumph's trade secrets and other proprietary information, assuming a position with Triumph's competitors–namely, AGI World, Inc. ("AGI World"), soliciting Triumph's clients, and violating his employment agreement with Triumph. (R. 4.) Triumph also sought an order requiring 1) Defendants to disclose all persons or entities to whom Defendant Ward disclosed Triumph's confidential information; 2) Defendants to account for and return to Triumph all originals and copies of Triumph's confidential materials; and 3) Defendant Ward to provide to the Court in a verified filing an accounting of all sales he made to the detriment of Triumph. (*Id.*)

The Honorable Matthew F. Kennelly, acting in his capacity as Emergency Judge, conducted a hearing on November 8, 2011, and granted Triumph's motion for a temporary restraining order on that same date. (R. 8; R. 9.) The Temporary Restraining Order ("TRO") enjoins Mr. Ward and all parties in active concert or participation with him, including Vital-X and CDP, from, among other things, 1) misappropriating, threatening to misappropriate, revealing or utilizing Triumph's trade secrets and other confidential information; 2) assuming a position with AGI World or related companies that would require him to inevitably use or disclose Triumph's trade secrets and other confidential information; 3) using, disclosing, disseminating, revealing, misappropriating or threatening to misappropriate any of Triumph's confidential or proprietary information or trade secrets; 4) owning any interest in, managing, controlling, participating in, consulting with, rendering services for, or in any manner engaging

in any business competing with Triumph's business, as such business existed or in the process of existing on September 20, 2011 within any geographical area in which Triumph engaged or has definitive plans to engage in such business; 5) either as an individual or for his own account, or as an officer, employee, agent or salesperson of any corporation, firm or other entity, directly or indirectly, whether or not for monetary benefit, soliciting or diverting any of Triumph's customers that were customers during the term of Mr. Ward's employment with Triumph; and 6) violating his Employment Agreement with Triumph.  (R. 9)

On November 13, 2011, Mr. Ward filed a motion to set a preliminary injunction hearing. (R. 13.)  The Court held a preliminary injunction hearing on November 16, 2011 and November 28, 2011, during which the following witnesses testified: 1) Bart McGuinn, Human Resources Director at AGI North America, LLC ("AGI"); 2) Randy Cecola, Chief Executive Officer of Triumph; 3) Patrice Calmels, former Director of Operations at AGI; 4) Mark Caines, Chief Executive Officer of AGI; and 5) Defendant Scott Ward.  During the hearing, the Court had the opportunity to determine the credibility of each witness.  The Court closely assessed the demeanor of each witness, including his body language, tone of voice, facial expressions, mannerisms and other indicative factors.  At the close of the hearing, the parties each presented oral argument.  The parties also filed written post-hearing submissions on November 29, 2011.

In Triumph's post-hearing brief, it narrowed the scope of its request for a preliminary injunction.  Specifically, it now seeks to enjoin Mr. Ward from the following:

    (1)      disclosing to any unauthorized person or use for his own purposes any Confidential Information[1] gained while working at Triumph;

_____

[1] Triumph does not explain what it means by "Confidential Information," but the Court assumes that it is coterminous with "Confidential Information" as it is defined in Mr. Ward's

3

(2)      refrain (for the remainder of this proceeding but no longer than twenty-four (24) months) from soliciting, diverting, or attempting to solicit or divert, any customer or active prospect of Triumph that was a customer or known active prospect during the term of Mr. Ward's employment;

(3)      refrain (for the remainder of this proceeding but no longer than twenty-four (24) months) from encouraging or soliciting an employee or vendor of Triumph to terminate or modify its relationship with Triumph, or to perform substantially similar services as those performed for Triumph while Mr. Ward was employed; and

(4)      refrain from engaging in an operational role regarding the design, development, manufacture or sale of food packaging folding cartons within the United States in any area where Triumph conducted such business at the time of Mr. Ward's termination.

*See* R. 40 at 2.  Triumph also requests that the Court require, in the preliminary injunction order, Mr. Ward to "return immediately all data, documents or media in his possession which contain Triumph's Confidential Information."  (*Id.*)

## FINDINGS OF FACT

### I.    The Parties

Triumph is an Illinois corporation with its principle place of business in Bolingbrook, Illinois.[2]  (Compl. ¶ 11.)  Defendant Ward is a resident and citizen of Illinois.  (*Id.* ¶ 12.) Defendant Vital-X is an Illinois corporation with its principal place of business in Barrington,

---

Employment Agreement.  *See* Hearing Ex. B, Employment Agreement § 6 (defining "Confidential Information" as "information, observations and data (including trade secrets) obtained by [Mr. Ward] while employed at [Triumph] concerning the business or affairs of [Triumph].")

   [2]  Unless otherwise noted, the facts is this section were testified to during the preliminary injunction hearing.  The Court makes these factual findings based on the evidence presented in Court after weighing the credibility of each witness who testified.  *See Lakeview Tech., Inc. v. Robinson*, 446 F.3d 655, 657-58 (7th Cir. 2006) (district courts have authority to, and should, assess credibility of witnesses during preliminary injunction hearings).

Illinois.  (*Id.* ¶ 13.)  Mr. Ward owned and controlled Vital-X until its recent involuntary dissolution.  (*Id.*)  CDP is a business enterprise that Mr. Ward owns and controls.  (*Id.* ¶ 14.)

## II.        Triumph's Business

Triumph is a privately-owned manufacturer.  (Plf's Hearing Ex. 10, Stipulated Facts for Preliminary Injunction Hearing ("Stip.") ¶ 1.[3])  Since 2005, Triumph has been in the business of offering high quality packaging services to large suppliers of consumer goods.  (Compl. ¶ 18.) At the time Triumph filed the Complaint, its only shareholders were Messrs. Cecola and Ward. (*Id.* at 19.)  Triumph's business includes designing, developing, printing, manufacturing, distributing and selling folding cartons.  (*Id.* ¶¶ 20-21.)  It also designs and converts graphics files used in producing folding cartons.  (*Id.*)  Mr. Cecola testified that since he purchased Triumph in 2005 out of bankruptcy, it has grown over 20% per year, compared to the industry average of approximately less than 2% per year.

Triumph has offered its services and provided products to several different industries, including consumer products, food, beauty and personal care, automotive and media.  (Defs' Hearing Ex. 10, Triumph Sales Data.)  The vast majority, approximately 85-95%, of Triumph's sales volume comes from folding carton sales to customers in the food industry.

## III.       Defendant Ward's Employment with Triumph

On September 5, 2005, shortly after Triumph's formation, Triumph hired Mr. Ward to serve as Triumph's Chief Operating Officer ("COO"), the same role in which he served until Triumph fired him on September 20, 2011.  (Stip. ¶ 2.)  At the time Triumph hired him, Mr.

---

[3]  Mr. Ward stipulated to certain facts for purposes of the preliminary injunction hearing only.

Ward signed an employment agreement (the "Employment Agreement"), which provided the terms and conditions of his employment. (Stip. ¶ 3; Hearing Ex. B, Employment Agreement.) The Employment Agreement required Mr. Ward to, among other things, 1) refrain from competing with Triumph while employed there and for a 24-month to 30-month period thereafter (Employment Agreement § 8); 2) refrain from soliciting Triumph's customers for anyone's benefit other than Triumph during his employment and for a 24-month period thereafter (*id.* § 9); and 3) refrain from soliciting Triumph's employees to perform services similar to those the employees performed for Triumph during his employment and for a 24-month period thereafter (*id.* § 10). In return for those covenants, Triumph allowed Defendant Ward access to its confidential information, paid him a salary of $175,000 per year, and gave him 50 shares of stock in Triumph. (Compl. ¶ 49.) On July 18, 2008, Mr. Ward executed the First Amendment to his Employment Agreement, pursuant to which his base salary increased to $260,000 with the opportunity for a performance-based increase. (Employment Agreement at Ex. A-1.)

In his role as COO, Mr. Ward personally interacted with Triumph's customers, vendors and other key business contacts on a regular basis. (Compl. ¶ 50.) He ran Triumph's day-to-day operations. As a result, he became aware of Triumph's confidential and proprietary information. Mr. Ward was instrumental in establishing and developing Triumph's pricing model, which included interpreting Triumph's pricing margins, vendor costs, market prices, labor rates, production speed and capability, and overhead.

## IV. Mr. Ward's Diversion of Triumph's Resources and Revenue During His Employment With Triumph

In 2010, while Mr. Ward was Triumph's COO and shareholder, he diverted resources and revenue from Triumph through 1) creating 3D mockups; 2) redesigning efforts of marketing

slogans; 3) redesigning efforts of product packaging; 4) engaging in conversations and meetings with representatives of one of Triumph's former customers, Silvestri Sweets ("Silvestri"), 5) producing tens of thousands of boxes for Silvestri, and 6) organizing and arranging for delivery of materials to Silvestri.  (Stip. ¶ 8; Compl. ¶ 60.)

Mr. Ward entered into an agreement with Silvestri, pursuant to which he utilized Triumph's assets and resources to, among other things, create packaging for Silvestri in exchange for payments to Mr. Ward and his corporations, which are also defendants in this lawsuit.  (Stip. ¶ 4.)  Mr. Ward discussed with Silvestri the prospect of leaving Triumph to work for Silvestri, and he used Triumph's resources, equipment, employees and materials to fulfill certain of Silvestri's orders.  (*Id*. ¶¶ 5-7.)  Neither Mr. Ward nor Silvestri paid Triumph for the use of those resources.  (*Id.* ¶ 6.)  Mr. Ward also took raw materials and equipment from Triumph to a space he leased in Lake Zurich, Illinois, for the purposes of starting an independent business manufacturing dog puzzles.  (*Id.* ¶ 12.)

In addition, Mr. Ward agreed with Michael Pastore of Mighty-Pac, Inc., one of Triumph's customers, to receive a commission on orders Mighty-Pac placed with Triumph for packaging materials.  (Stip. ¶ 9.)  Mr. Ward did not disclose that commission to Triumph.  (*Id*.)  Further, Mr. Ward agreed with Mr. Pastore that he would receive a commission on orders for packaging that Triumph placed with Forest Packaging, one of Triumph's vendors.  (*Id*. ¶ 10.)  Additionally, Mr. Ward requested and received a "commission" for purchasing products from Delta Machine Services, Inc., another of Triumph's vendors.  (*Id.* ¶ 11.)  He also paid Triumph's employees directly to assist with his activities.  (*Id.* ¶ 13.)

## V.     Mr. Ward's Employment with AGI

AGI World is a global packaging company with its only North American plant in Melrose Park, Illinois.  AGI hired Mr. Ward as a Vice President and General Manager of the Melrose Park plant in early November 2011.  AGI manufactures various types of packaging, including CD and DVD box sets, inserts for records and other media, and folding cartons.  It also designs certain components of video game packaging.  Mr. Caines, AGI's CEO, testified that AGI is focused on high-end packaging primarily in the media and entertainment industries and that AGI has the ability to print high-quality embellishments and embossing.

Messrs. McGuinn and Caines testified that media as a percentage of AGI's business is on the decline.  The industries to which AGI currently caters and the type of products AGI's Melrose Park plant provides are broken down as follows:

| Market | % of Business | Package Type |
|---|---|---|
| Video | 37% | DVD |
| Personal | 23% | Folding Carton |
| Music | 20% | CD |
| Design | 7% | EA projects |
| Multi-media | 7% | Game |
| Other | 6% | Tobacco (printing) |

Defs' Hearing Ex. A.  Messrs. McGuinn and Caines testified that AGI's Melrose Park plant does not do any food packaging.  Furthermore, AGI's Melrose Park plant does not have the necessary certifications that it would need in order to do food packaging.[4]

---

[4] In addition, Mr. Caines credibly testified that food packaging is done on recycled paper board, while AGI's packaging is done on "virgin" board.  He explained that it is difficult to switch back and forth between the two because the recycled board leaves bits of lint that affect the quality of printing on virgin board.

AGI is a "turnaround company"[5] that has, within the last two years, undergone a change in ownership and management. Mr. Caines, AGI's Chief Executive Officer, for example, began his position in approximately October 2010. AGI hired Mr. Calmels as Director of Operations in March 2010 and assigned to him the task of making AGI's Melrose Park plant profitable. Mr. Calmels was not successful in doing so. AGI hired Mr. Ward as Vice President and General Manager of the Melrose Park plant in November 2011, and it assigned Mr. Calmels to a different position within AGI. Mr. McGuinn testified that Mr. Ward visited the Melrose Park plant for a few hours on Friday, November 4, 2011, and that he reported to his first day of work with AGI on Monday, November 7, 2011, the day before Judge Kennelly issued the TRO. Mr. Ward has not worked since that date, although AGI has paid him for four days of work.

Mr. Ward's duties and responsibilities as Vice President and Plant Manager of AGI North America, LLC will involve overseeing the operations within AGI's Melrose Park plant. Specifically, he will use his background and expertise in lean manufacturing processes to ensure that the machines run efficiently, the raw material is used efficiently, the labor is employed efficiently, and the staff are properly trained to run the machines. AGI hired Mr. Ward, in part, because he has a Six Sigma certification and has extensive experience in the packaging industry, including experience implementing data collection systems and with lean manufacturing processes.[6] Mr. Ward testified that he obtained his Six Sigma certification in 2003, which was

---

[5] Mr. Randy Cecola, Triumph's CEO, testified that he defines a "turnaround company" as a distressed business.

[6] According to the Six Sigma website, Six Sigma and lean manufacturing "are toolkits to reduce waste in business practices," and Six Sigma is "a philosophy of doing business with a focus on eliminating defects through fundamental process knowledge." The website also provides that "[s]ix sigma methods integrate principles of business, statistics and engineering to

before he began his employment with Triumph.  He further testified that he has used Six Sigma

tools both inside and outside of the packaging industry to run complex projects and that he

considers himself an expert in lean manufacturing.  Mr. Ward's duties at AGI will also include

managing the workers on the shop floor.  Mr. Ward has a bachelor's and master's degree in

human organizational behavior, and he has extensive management and operational experience.

(R. 43-1, Ex. D, Ward Resume.)  His position at AGI may involve some incidental contact with

AGI's customers and vendors with respect to quality control issues, but he will not have

involvement with AGI's sales, pricing, marketing, purchasing, or business promotion.  AGI's

purchasing is done through global contracts that are already in place.

## VI.    AGI's Potential Merger with Shorewood Packaging

AGI is working toward a merger with a company called Shorewood Packaging.  If the

merger is approved, the new global company will "focus on its core markets in consumer, media

and entertainment, and tobacco packaging, including beauty and personal care, cosmetics and

fragrance, healthcare and pharmaceuticals, consumer electronics, golf, confectionery and

specialty foods and specialty gravure."  *See* Hearing Ex. B, Press Release at 2.  Mr. McGuinn

testified that if the merger goes through as planned, AGI's Melrose Park plant will focus on

specialty packaging, such as DVD and CD box sets, and it will not manufacture packaging for

food companies.  Mr. McGuinn also testified that Mr. Ward's duties after the merger will not

involve customer relations, pricing, sales, purchasing, or marketing.

---

achieve tangible results" and that six sigma tools are applicable across many different aspects of
a business, including production, sales, marketing, design, administration and service.  *See*
www.sixsigmasystems.com/what.php.

# LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy intended to preserve the status quo until the merits of a case may be resolved." *Indiana Civil Liberties Union v. O'Bannon*, 259 F.3d 766, 770 (7th Cir. 2001). A preliminary injunction is "a very serious remedy," and it is "never to be indulged in except in a case clearly demanding it." *Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041, 1044 (7th Cir. 2000) (internal quotation omitted). To succeed on a motion for a preliminary injunction, a party must show that (1) it has some likelihood of success on the merits; 2) it has no adequate remedy at law; and 3) it will suffer irreparable harm if the court does not grant the preliminary injunction. *See Ezell v. City of Chicago*, 651 F.3d 684, 694 (7th Cir. 2011) (citations omitted). To meet its burden on the first element, Triumph must show that it is "reasonably likely to succeed on the merits." *See Christian Legal Soc'y v. Walker*, 453 F.3d 839, 859 (7th Cir. 2006)).[7]

If the moving party demonstrates the above three factors, "the district court weighs the factors against one another, assessing whether the balance of harms favors the moving party or whether the harm to the nonmoving party or the public is sufficiently weighty that the injunction

---

[7] Triumph argues that it need only establish that it has "a better than negligible" chance of succeeding on the merits, relying on *Meridian Mutual Ins. Co. v. Meridian Ins. Grp., Inc.*, 128 F.3d 1111, 1114 (7th Cir. 1997). (R. 40 at 10.) The *Meridian Mutual* decision, however, is over 14 years old, and since that time, the Seventh Circuit has held repeatedly that a party must prove that it is "reasonably likely to succeed on the merits" in order to obtain a preliminary injunction. *See Coronado v. Valleyview Public School Dist. 365-U*, 537 F.3d 791, 795 (7th Cir. 2008); *Christian Legal Soc'y*, 453 F.3d at 859; *Joelner v. Village of Wash. Park, Ill.*, 378 F.3d 613, 619 (7th Cir. 2004); *AM Gen. Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 803 (7th Cir. 2002); *Ezell*, 651 F.3d at 694 (citing, with approval, *Christian Legal Soc'y* and *Joelner*); *but see Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of Am.*, 549 F.3d 1079, 1096 (7th Cir. 2008) (requiring a "better than negligible" chance of success on the merits). Triumph has not satisfied either standard.

should be denied." *Ezell*, 651 F.3d at 694 (citing *Christian Legal Soc'y*, 453 F.3d at 859). The balancing process "involves engaging in. . . [a] sliding scale approach; the more likely the plaintiff will succeed on the merits, the less the balance of irreparable harms need favor the plaintiff's position." *Ty, Inc. v. Jones Grp., Inc*., 237 F.3d 891, 895 (7th Cir. 2001).

## ANALYSIS

**I.      Triumph Is Not Entitled to an Injunction on its Illinois Trade Secrets Act Claim Because It Is Not Likely To Succeed on the Merits of That Claim**

To prove that Mr. Ward violated the ITSA, Triumph must show 1) the existence of a trade secret; and 2) misappropriation of that trade secret. *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1267 (7th Cir. 1995). The ITSA defines a "trade secret" as

> information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that: (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

*See* 765 ILCS 1065/2(d). "Where an employer has invested substantial time, money, and effort to obtain a secret advantage, the secret should be protected from an employee who obtains it through improper means." *Mintel Int'l Grp., Ltd. v. Neergheen*, No. 08-cv-3939, 2010 WL 145786, at *11 (N.D. Ill. Jan. 12, 2010) (citation omitted). In a competitive market, however, "an employee must be entitled to utilize the general knowledge and skills acquired through experience in pursuing his chosen occupation." *Id.* (citing *Serv. Ctrs. of Chicago, Inc. v. Minogue*, 180 Ill. App.3d 447, 452, 535 N.E.2d 1132 (1st Dist. 1989)). Trade secrets include

"customer lists that are not readily ascertainable, pricing, distribution, and marketing plans, and sales data and market analysis information." *Id.* (internal citations omitted).

The ITSA defines "misappropriation" to include, among other things, "disclosure or use of a trade secret" without consent by a person who "at the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." 765 ILCS § 1065/2(b)(2)(B)(II).[8] Under the ITSA, a court may enjoin actual and threatened misappropriation of trade secrets. *See* 765 ILCS 1065/3(a). As the Seventh Circuit has explained, "[t]rade secret law serves to protect standards of commercial morality and encourage invention and innovation while maintaining the public interest in having free and open competition in the manufacture and sale of unpatented goods." *PepsiCo*, 54 F.3d at 1268 (internal quotations and citation omitted). When a plaintiff sues to prevent threatened, and not actual, misappropriation of trade secrets, this "tension is particularly exacerbated." *Id.*

Triumph argues that it will likely succeed on its claim for threatened misappropriation of trade secrets. First, it argues that the information that Mr. Ward acquired through his employment with Triumph, including Triumph's customer and pricing information as well as its manufacturing processes and improvements thereto, constitute trade secrets. It also argues that it will be able to prove, through the doctrine of inevitable disclosure, that Mr. Ward will misappropriate Triumph's trade secrets in his new position with AGI.

---

[8] 765 ILCS 1065/2(b) lists additional alternative definitions of "misappropriation," but none of those are at issue in this case. *See* R. 5 at 25.

### A.     Trade Secrets

Triumph contends that the trade secrets at issue consist of 1) Triumph's pricing and customer information, including the pricing model and customer-specific price points; and 2) Triumph's "manufacturing processes and improvements thereto."  (R. 40 at 18-21.)

Mr. Cecola testified that Triumph's pricing strategy is unique because it incorporates Triumph's confidential information, including, among other things, the cost of raw materials, ink prices, machine speeds, and Triumph's overhead costs.  He further testified that only three people at Triumph, including Mr. Ward during the time he was employed there, know the pricing strategy.  Mr. Cecola testified that Triumph has a confidentiality agreement with its customers that prohibits either side from disclosing Triumph's prices to competitors and that Triumph does not expect that its customers will disclose price points to Triumph's competitors.  Based on these facts, Triumph is reasonably likely to succeed in proving that its pricing model, customer-specific pricing information, and its customer lists, to the extent the customers are not publicly known,[9] are "trade secrets" under the ITSA.  *See Mintel*, 2010 WL 145786, at *11 (citing *PepsiCo*, 54 F.3d at 1268); *APC Filtration, Inc. v. Becker*, 646 F. Supp.2d 1000, 1010 (N.D. Ill. 2009) (price lists that are tailored to specific customers based on their needs and their relationships with the company are trade secrets under the ITSA).

To the extent Triumph argues that its "lean manufacturing" and efficient operations constitute trade secrets, Triumph is not likely to succeed on the merits.  Triumph has failed to identify any specific "lean manufacturing" process that is specific to Triumph, and the

---

[9] Triumph concedes that approximately half of its customers are publicly-known.  (R. 5-1, Cecola Decl. ¶ 20.)

overwhelming evidence demonstrates that Mr. Ward had extensive experience and training in lean manufacturing prior to his employment with Triumph. Triumph has not established that its lean manufacturing and efficient processes are not simply a skill set that Mr. Ward has acquired during his 20-plus years in the packaging business. *See Mintel*, 2010 WL 145786, at *11 (the definition of a trade secret cannot be so broad as to encompass an employee's "general knowledge and skills acquired through experience in pursing his chosen occupation"); *see also PepsiCo*, 54 F.3d at 1268 (trade secret law "should not prevent workers from pursuing their livelihoods when they leave their current positions").[10] Triumph also has not explained what measures, if any, it took to keep the information regarding its lean manufacturing and efficient processes secret. *See* 765 ILCS 1065/2(d)(1).

The answer is less clear, however, with respect to Triumph's "customer-specific manufacturing processes." (R. 20 at 20-21.) During his first day of testimony, Mr. Cecola testified about Triumph's "efficient processes" in the context of its operational and lean manufacturing processes–testimony that related to the logistical structure of the packaging plant itself. Mr. Cecola did not identify or elaborate upon any customer-specific Triumph process at that time. Triumph did not present any evidence of Triumph's specific manufacturing processes until 12 days later, during Mr. Cecola's re-direct examination. The timing of this re-direct testimony is suspect, especially given that the Court, after the first day's hearing, expressed concern as to whether the information Triumph had presented on the first day of testimony

---

[10] Mr. Ward served as a lean manufacturing consultant for several years prior to his employment with Triumph. Mr. Caines testified that Mr. Ward's lean manufacturing training and experience, much of which was acquired prior to his employment with Triumph, was a key reason why AGI hired Mr. Ward.

constituted trade secrets. Giving Triumph the benefit of the doubt, however, there is a reasonable likelihood that Triumph will be successful in proving that at least some of its "customer-specific manufacturing processes," such as its formula and procedure for creating the customer-specific blue color on one of its customer's food packages, are trade secrets.[11] *See, e.g., Chemetall GMBh v. ZR Energy, Inc.*, 138 F. Supp.2d 1079, 1083 (N.D. Ill. 2001) (finding certain parts of an otherwise-known manufacturing process were trade secrets due to the plaintiff's development and calibration of those elements to create a product having specific qualities). Mr. Cecola testified that Triumph creates specific processes and ink colors for its customers, and that it devotes a substantial amount of time and energy in doing so. He also testified that Triumph maintains this information as confidential, allowing access to only a few employees. Because of the time and resources Triumph expended in developing these customer-specific processes, as well as the value Triumph places on them, these processes are likely sufficiently secret to derive actual or potential economic value from not being generally known to other persons who can obtain economic value from their disclosure or use. *See* 765 ILCS 1065/2(d); *Chemetall*, 138 F. Supp. at 1083.

---

[11] To the extent Triumph argues that hexachrome printing is a trade secret, that claim is not likely to succeed. Mr. Cecola testified that Triumph employs a hexagon printing technology and that it believes it is the only company in the folding carton industry to employ this technology. Mr. Cecola admitted, however, that Triumph owns no patents and that the hexagon printing technology has been used in the commercial printing industry for many years. Further, Mr. Caines credibly testified that there is nothing unique about hexagon printing technology in the packaging industry and that it has been used in the industry over the past ten years.

### B.    Threatened Misappropriation[12]

Triumph argues that it will be successful in its claim for threatened misappropriation of trade secrets under the inevitable disclosure doctrine, pursuant to which "a plaintiff may prove a claim of trade secret misappropriation by demonstrating that defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets." *See PepsiCo*, 54 F.3d at 1269; *see also Strata Marketing, Inc. v. Murphy*, 317 Ill. App.3d 1054, 1069, 740 N.E.2d 1166 (1st Dist. 2000) ("*PepsiCo* correctly interprets Illinois law and [we] agree that inevitable disclosure is a theory upon which a plaintiff in Illinois can proceed under the [Illinois Trade Secrets Act]."). The Court disagrees.[13]

Courts consider the following factors in determining whether disclosure of trade secrets is inevitable: "(1) the level of competition between the former employer and the new employer; (2) whether the employee's position with the new employer is comparable to the position he held with the former employer; and (3) the actions that the new employer has taken to prevent the former employee from using or disclosing trade secrets of the former employer." *Saban v. Caremark Rx, L.L.C.*, 780 F. Supp.2d 700, 734 (N.D. Ill. 2011) (citing *RKI, Inc. v. Grimes*, 177

---

[12]  In Triumph's post-hearing brief (R. 40), it narrowed its preliminary injunction argument significantly when compared to its initial motion for a preliminary injunction (R. 25). In its post-hearing brief, Triumph did not argue that the Court should issue a preliminary injunction order because Mr. Ward actually misappropriated Triumph's trade secrets. Rather, Triumph rested its trade secret argument solely on the threat of misappropriation via the inevitable disclosure doctrine. Even if Triumph had not narrowed its argument, however, the Court's decision would be the same.

[13]  Courts in this District have held that the inevitable disclosure doctrine applies to both ITSA and breach of non-compete clause claims. *See, e.g., Océ N. Am. v. Brazeau*, No. 09 C 2381, 2010 WL 5033310, at *7 (N.D. Ill. Mar. 18, 2010). Because the Court concludes that the inevitable disclosure doctrine does not apply to this case, the Court need not decide the issue of whether it applies to both of Triumph's claims.

F. Supp. 2d 859, 873 (N.D. Ill. 2001)). "[T]he mere fact that a person assumed a similar position

at a competitor does not, without more, make it 'inevitable that he will use or disclose ... trade

secret information' so as to 'demonstrate irreparable injury.'" *PepsiCo*, 54 F.3d at 1269 (quoting

*AMP Inc. v. Fleischhacker*, 823 F.2d 1199, 1207 (7th Cir. 1987)). Moreover, the employer's

fear that its former employee will use the trade secrets in his new position is insufficient to

justify application of the inevitable disclosure doctrine. *Saban*, 780 F. Supp.2d at 734 (citing

*PepsiCo*, 54 F.3d at 1268-69). Instead, the employer must demonstrate a "high probability" that

the former employee will use them. *Id.* (citing *PepsiCo*, 54 F.3d at 1268-69). Courts do not

often apply the inevitable disclosure doctrine, recognizing that "a broad application would be an

effective bar against employees taking similar positions with competitive entities." *Océ N. Am.,*

*Inc. v. Brazeau*, 09 C 2381, 2009 6056775 (N.D. Ill. Sept. 4, 2009) (citing *Quixote Trans. Safety,*

*Inc. v. Cooper*, 03 C 1401, 2004 WL 528011, at *6 (N.D. Ill. Mar. 12, 2004)). The Court,

therefore, is cautious in its application of this doctrine.

 As an initial matter, this case is readily distinguishable from the Seventh Circuit's

decision in *PepsiCo*. There, the Seventh Circuit affirmed the district court's holding that a high-

level employee who had knowledge of PepsiCo's most protected trade secrets would be "unable

to compartmentalize" PepsiCo's trade secrets in his new, similar position with PepsiCo's direct

competitor, Quaker Oats, and therefore he would inevitably disclose those trade secrets in

connection with his new employment. 54 F.3d at 1270. *PepsiCo* involved two "fierce"

competitors in the sports and "new age" drink industry. The defendant worked as a General

Manager of PepsiCo's California's business unit before leaving PepsiCo to work as Vice

President of Field Operations for Gatorade at Quaker Oats. In his position at PepsiCo, the

defendant was privy to, among other things, PepsiCo's business plans with respect to its sports and new age drinks, as well as its pricing structure and price points.  Significantly, there was evidence that the defendant, in his new position, would have substantial input as to the pricing, costs, margins, distribution systems, products, packaging and marketing of Quaker Oats' sports and new age drinks.  *Id.* at 1266.

The most important fact distinguishing this case from *PepsiCo* is that Triumph and AGI are not "fierce," or even direct, competitors.  It is true that they both manufacture folding cartons.  Triumph's business is almost exclusively focused on folding carton packaging, while only 23% of AGI's North American business involves folding carton packaging.  Moreover, the companies operate in mostly separate industries.  The vast majority of Triumph's sales comes from food and confectionary customers, and a small amount comes from personal care and media customers.  AGI, on the other hand, operates primarily in the media industry in its non-folding carton endeavors, though it also manufactures a small amount of folding cartons for the personal care industry.  AGI does not currently do any business with customers in the food industry.  Indeed, it does not have the capacity or appropriate licensing to package food items, and it has no plans to package food items at the Melrose Park plant in the future.

Additionally, Triumph and AGI do not currently share *any* customers.[14]  One of AGI's current customers in the personal care industry was formerly a customer of Triumph's in 2008, but Triumph did a relatively small amount of business with it that year and has not done business with it since 2008.  Triumph represented to the Court at the hearing that it intends to sign a

_____

[14]  Before the preliminary injunction hearing, both Triumph and AGI submitted their customer lists to the Court for an *in camera* review.  AGI and Triumph currently each have well over 60 customers, and significantly, they do not share a single customer.

contract with that particular customer in the near future, but it has not informed the Court that it has indeed done so, nor has it told the Court the amount of sales Triumph would make to that customer pursuant to the new agreement. Even if Triumph is successful in securing that customer's business, however, it does not follow that AGI and Triumph are direct competitors.[15]

Triumph argues that there is the *potential* for competition between AGI and Triumph in the folding carton industry and that such potential is sufficient to justify a preliminary injunction here. The Court disagrees. While the Court recognizes the future potential for competition between the two entities in the personal care folding carton industry, the fact that less than a quarter of AGI's business is focused on folding cartons, and the fact that Triumph and AGI historically share only one customer and are predominantly focused on industries other than personal care, necessitates a conclusion that the potential for direct competition between the two entities is minimal, at best.

The Court is similarly unpersuaded by Triumph's argument that because AGI is a turnaround business that is mainly focused on the media industry, and the media industry's need for packaging services is declining, AGI will inevitably move to the food service industry (and compete with Triumph) to make up for lost profits. Messrs. Caines and McGuinn's testimony directly contradicts this argument. Both testified credibly that there are no plans for AGI's Melrose Park plant to perform packaging services for the food industry, and Mr. Caines testified that AGI has not hired any food industry sales representatives.[16] Moreover, Mr. Caines also

---

[15] Moreover, there is no concern with AGI having an unfair advantage with respect to this customer because it was AGI's customer prior to Mr. Ward's employment with AGI.

[16] Shorewood, the company with which AGI plans to merge, does some food packaging, but there is no evidence that such packaging would take place at AGI's Melrose Park plant or

testified that if AGI were to go into the food packaging business, it would be an "uphill battle" and would require, among other things, a drastic change in company philosophy as well as significant machinery purchases. Although Mr. Caines conceded that AGI would potentially look at high-end food packaging in the future if the opportunity presented itself, AGI has no plans to do so.[17]

Triumph mistakenly relies on *Interbake Foods, L.L.C. v. Tomasiello et al.,* 461 F. Supp.2d 943 (N.D. Iowa 2006) in support of its argument that the Court should apply the inevitable disclosure doctrine in light of the potential for future competition between AGI and Triumph. *See* R. 40 at 24. The court in *Interbake Foods* found that the plaintiff had *not* met its burden of proving a likelihood of success on its threatened misappropriation/inevitable disclosure claim, and the court did not base its decision to grant a limited preliminary injunction on that ground. 461 F. Supp.2d at 975. Additionally, unlike here, the "new" employer in *Interbake Foods* had taken significant and substantial steps toward establishing itself in the industry in which the "old" employer competed, including investing over $11 million in equipment and facilities, entering into provisional and final agreements with a major customer, and engaging, over a two-year period, in extensive research and development efforts to design a production platform for the new product. *Id*. at 951. These facts are in stark contrast to this

_____

that Mr. Ward would be involved in any way with such packaging.

[17] Triumph argues, without any citation to the record, that AGI is "active[ly] solicit[ing]" the packaging business of a food company. (R. 40 at 14.) Mr. Caines testified that an old contact of his from that company called AGI to ask about packaging, but Mr. Caines has not pursued that customer, and he testified that it would be better off using its current folding carton manufacturer. This credible testimony directly rebuts Triumph's contention that AGI has plans to enter the food industry.

case. The Court must base its considerations on the evidence in the record, and it declines

Triumph's invitation to speculate on the future of AGI's business or Mr. Ward's potential role at

AGI at some unspecified point in the future. Neither the law nor the facts of this case support

such speculation.

In addition to the lack of competition between AGI and Triumph, the second inevitable

disclosure factor weighs in Mr. Ward's favor because Mr. Ward's position at AGI is not

comparable to his former position at Triumph. AGI employees' credible testimony establishes

that Mr. Ward will not have involvement with AGI's marketing, business promotion, pricing, or

purchasing, and his contact with AGI's vendors and customers will be limited to that relating to

quality control issues as they pertain to the operations of the Melrose Park plant. Therefore,

unlike the defendant in *PepsiCo*, Mr. Ward's new position will be dissimilar from his position at

Triumph in a variety of ways. Additionally, there is no evidence in the record that Mr. Ward's

new position will require him to use or disclose Triumph's trade secrets, and he testified credibly

that he will not do so. Indeed, the evidence has established that Mr. Ward's duties and

responsibilities at AGI's plant will focus on logistics and overseeing operations within the

Melrose Park plant rather than AGI's relationships with customers and vendors. While Mr.

Ward will have the responsibility of overseeing AGI's manufacturing, there is no indication that

he will use or disclose any of Triumph's "customer-specific processes"—in large part because,

as stated above, Triumph and AGI do not share any customers and operate in almost entirely

separate industries.

The third inevitable disclosure factor also weighs in Mr. Ward's favor. Although there is

no evidence that AGI has done anything affirmative to prevent Mr. Ward from using or

disclosing Triumph's trade secrets to AGI, the evidence in the record demonstrates that Mr. Ward's role at AGI presents no reasonable danger of him using or disclosing that information such that AGI would need to take preventative action. Messrs. McGuinn and Caines testified that Triumph's trade secrets are not applicable to AGI's business and that AGI does not want Mr. Ward to disclose Triumph's trade secrets. Additionally, Mr. Caines testified credibly that Mr. Ward has not disclosed any of Triumph' confidential information to him, and Mr. Ward testified to the same. Furthermore, there is no evidence that AGI hired Mr. Ward for the purpose of extracting Triumph's trade secrets from him. Indeed, Mr. Caines testified that he does not consider Triumph and AGI to be competitors and that despite being in the packaging business for some time and having served as a director of a trade association for the packaging industry, he had never heard of Triumph until meeting Mr. Ward.

Finally, Triumph makes much of Mr. Ward's lack of candor to Triumph during the time he was employed there, and it argues that such evidence counsels in favor of applying the inevitable disclosure doctrine. The Court again disagrees.[18] Although, based on the facts in the record, Mr. Ward was less than honest with Triumph regarding his self-dealing during the time he was employed at Triumph, the Court finds that Mr. Ward was credible and forthcoming in his testimony regarding his employment at AGI and his understanding of his obligations under his Employment Agreement and Illinois law not to disclose Triumph's trade secrets or solicit its

---

[18] As Triumph concedes in its Complaint, any harm Triumph suffered as a result of Mr. Ward's past conduct during his employment with Triumph can be remedied through monetary damages. *See, e.g.*, Compl. ¶¶ 66, 77; *see also Liebert Corp. v. Mazur*, 357 Ill. App. 3d 265, 283 (1st Dist. 2005) ("Injunctive relief, by its nature, addresses only what could happen in the future and cannot remedy misconduct . . . that occurred in the past.") (citation omitted).

customers or employees.[19]  *See Lakeview Technology*, 446 F.3d at 657-58 (district courts have

discretion to determine whether employee's denials that he will use or disclose trade secrets are

truthful); *PepsiCo*, 54 F.3d at 1271 (district courts have discretion to determine credibility of

witnesses in preliminary injunction hearings).  Moreover, the testimony of Mr. Caines, which

corroborates Mr. Ward's to the extent that Mr. Ward will not use or disclose Triumph's

confidential information in connection with his employment at AGI, was extremely credible.[20]

In addition, although Triumph does not argue otherwise, there is no evidence in the record that

Mr. Ward has engaged in any improper solicitations of Triumph's clients or employees since

Triumph fired him.

Triumph's attempt to analogize this case to *Liebert Corporation v. Mazur* falls short.  357

Ill. App.3d 265.  In *Liebert*, the Illinois Appellate Court held that there was sufficient evidence to

show that a former territory sales manager would inevitably disclose his former employer's trade

secrets in his new position with a company that he and his former colleagues started while they

were still working for the former employer.  *Id.* at 286.  There are several distinctions between

---

[19]  Although, as Triumph points out, Mr. Ward's testimony that he has not and will not disclose Triumph's trade secrets does not foreclose the Court from issuing a preliminary injunction, *see Lakeview Tech.*, 446 F.3d at 657-58, the Court finds Mr. Ward's testimony credible in light of all of the evidence in the record.  Additionally, the Court finds the testimony of AGI's witnesses extremely credible, and both Messrs. McGuinn and Caines testified that Triumph's trade secrets would not be useful to AGI.  Mr. Caines further testified that Mr. Ward has not disclosed any trade secrets to AGI.

[20]  In this and other respects, this case is vastly different from *Lakeview Technology*, on which Triumph relies.  *See* R. 40 at 25.  There, the Seventh Circuit reversed the district court's denial of the request for a preliminary injunction in part because the district court accepted the former employee's assurances that he would not violate his obligations under his employment agreement at face value and did not conduct an evidentiary hearing to assess the former employee's credibility.  Here, in contrast, the Court conducted a two-day hearing, during which five witnesses, including Mr. Ward, testified and were subject to cross-examination.

*Liebert* and the present case. First, unlike here, the new and the old employers in *Liebert* were "direct competitors" of one another. *Id.* at 268, 286.[21] Second, the court held that the former employee misappropriated trade secrets through improper acquisition–namely, downloading 40 banker boxes' worth of the former employer's confidential information, including trade secrets, and intentionally deleting the application log that would have shown definitively whether he burned the confidential information to a CD. *Id.* at 282. The appellate court applied an adverse inference presumption to the former employee's testimony given that he destroyed relevant evidence. *Id.* at 286. Here, Triumph does not argue, and has presented no evidence, that Mr. Ward obtained Triumph's trade secrets through improper means or that he accessed Triumph's confidential information and subsequently tried to hide his tracks.[22] Instead, Triumph contends that Mr. Ward became privy to Triumph's trade secrets during the normal course of his employment with Triumph. *See, e.g.* Compl. ¶¶ 33-39.

Most importantly, Mr. Ward's lack of candor toward Triumph during the time he worked there, however improper it may have been, does not make up for the key facts that Triumph and AGI are not direct competitors and Mr. Ward's job at AGI will be substantially different from

---

[21] Indeed, there was evidence that the new employer's executives "wanted to 'cripple Liebert in Chicago for at least six months' by convincing its sales representatives to switch companies." *Id.* at 286.

[22] Mr. Ward testified that he has given all of Triumph's physical computers and hard drives in his possession to either Triumph or to his attorneys. He admitted to accessing certain of Triumph's documents on the hard drive he had at home after Triumph fired him, but he testified credibly that he did so for the purposes of this lawsuit only. Specifically, he accessed those documents in order to respond to Triumph's discovery requests and to assist with settlement negotiations. There is no evidence in the record that Mr. Ward made copies of those documents or otherwise inappropriately used or disclosed them. To the contrary, Mr. Ward testified credibly that he has not provided that information to anyone other than his counsel.

his former position at Triumph. Therefore, this is not one of the rare instances where application of the inevitable disclosure doctrine is warranted.

Because Triumph has failed to establish a likelihood of success on its claim for threatened misappropriation of trade secrets under the ITSA, it is not entitled to a preliminary injunction on that claim. *See Girl Scouts of Manitou Council, Inc.*, 549 F.3d at 1086 ("If the court determines that the moving party has failed to demonstrate any one of these three threshold requirements [some likelihood of success on the merits, irreparable harm, and no adequate remedy at law], it must deny the injunction.").

## II. Triumph Is Not Entitled to a Preliminary Injunction Based On Its Breach of Contract Claim

Triumph is not entitled to a preliminary injunction based on Mr. Ward's alleged breach or threatened breach of his Employment Agreement. With respect to the confidentiality and non-solicitation provisions (Employment Agreement §§ 6, 9, 10), there is no evidence that Mr. Ward is or has threatened to solicit Triumph's customers or employees, or that he is disclosing or has threatened to disclose Triumph's confidential information, since the time he left employ of Triumph or, more specifically, in connection with his employment at AGI. In addition, Mr. Ward is subject to ongoing confidentiality and non-solicitation obligations by virtue of his Employment Agreement, a fact that he acknowledged under oath to the Court. Therefore, Triumph is not likely to succeed on the merits of its claims for breaches of the solicitation or confidentiality clauses in the Employment Agreement.[23]

---

[23] As stated above, the Court is opining as to Mr. Ward's likely future, not past, conduct.

Triumph is also not entitled to a preliminary injunction based on Mr. Ward's alleged breach or threatened breach of the anti-compete clause in the Employment Agreement, which is extremely overbroad and likely unenforceable.  (Employment Agreement § 8.)  In Illinois, restrictive covenants are disfavored and are therefore "carefully scrutinized."  *See Liautaud v. Liautaud*, 221 F.3d 981, 986 (7th Cir. 2000).  Non-compete clauses are unenforceable when they 1) impose restrictions greater than those necessary to protect the legitimate interests of the protected party; 2) are oppressive to the restricted party; or 3) are harmful to the general public. *Id.* (collecting Illinois cases).

The non-compete clause in the Employment Agreement restricts Mr. Ward, for a period of at least 24 months, from "directly or indirectly own[ing] any interest in, manag[ing], control[ling], participat[ing] in consult[ing] with, render[ing] services for, or in any manner engag[ing] in any business competing with the business of [Triumph], as such business exists or is in process on the date of the termination or expiration of the Employment Period, within any geographical area in which [Triumph] or its Subsidiaries engage or have definitive plans to engage in such business."  (Employment Agreement ¶ 8.)  The Employment Agreement defines the "business of [Triumph]" as including "without limitation, (i) the design, development, printing, manufacture, distribution and sale of folding cartons, (ii) the co-packaging of, and fulfillment services for, consumer and commercial products, and (iii) the design and conversion of graphics files used in the production of folding cartons."  (*Id.*)

There are several problems with this anti-compete clause.  First, it is extremely broad in geographical scope.  It prohibits Mr. Ward from working with any competitor "within any geographical area" of where Triumph or its subsidiaries engage in business or have plans to

engage in business. Triumph's CEO testified that it engages in business in approximately half of the United States, and Triumph maintains that the geographic

scope is not overbroad because it allows Mr. Ward to work in 20 states without violating the anti-compete clause. Mr. Ward argues that because Triumph has an online presence from which potential customers can contact it, it technically engages in business everywhere in the world. Even accepting Triumph's more narrow reading, over half of the United States is an extremely broad geographic area. In addition, the qualifying term "within any geographical area" is unclear and does not provide any degree of certainty as to where Mr. Ward may work without violating the provision.

The cases Triumph cites in support of its argument that the geographic scope is not overbroad are inapposite. The restrictive covenant in *Dam, Snell & Taveirne, Ltd. v. Verchota*, 324 Ill. App.3d 146, 148, 754 N.E.2d 464 (2d Dist. 2001), for example, though unlimited in geographic scope, was limited such that the former employee was barred only from performing accounting services for the former employer's then-existing clients. *See also Stream Sales Corp. v. Summers*, 405 Ill. App.3d 442, 459-60 (2d Dist. 2010) (restrictive covenant with no geographic limitation was enforceable because the former employee was barred only from soliciting and servicing customers who had worked with the former employer during the previous two years); *Aspen Marketing Servs., Inc. v. Russell*, No. 09 C 2864, 2009 WL 4674061 (N.D. Ill. Dec. 3, 2009) (six-month restrictive covenant containing no geographic limitation was enforceable where it was tailored to prohibit the former employee from soliciting the former employer's former clients, current clients, and current business prospects). The anti-compete clause at issue here, as discussed below, prohibits Mr. Ward from working for any commercial

or consumer product packaging company, in any capacity, in all but 20 states, regardless of who the company's customers are.

Second, the duration of the non-compete clause–24 months by default and 30 months if Mr. Ward breaches his obligations under the agreement during the prior 24 months–is very lengthy. As Mr. Ward points out, where "the temporal and geographic restrictions on an employee's conduct are broad, as they are here, the agreement's activity restrictions should be correspondingly narrowly drawn to protect the employee's ability to be employed in his chosen field." *Océ N. Am., Inc.*, 2009 WL 6056775 at *8 and 2010 WL 5033310 at *9 (finding unenforceable a one-year covenant not to compete that barred former employee from working for a "competing business" in the United States). That clearly is not the case here, where the non-compete clause prohibits Mr. Ward from working in any capacity, or associating in any way, with any of Triumph's competitors. *See, e.g., Del Monte Fresh Produce, N.A., Inc. v. Chiquita Brands Int'l, Inc.*, 616 F. Supp. 2d 805 (N.D. Ill. 2009) (finding a similar non-compete clause unenforceable because "agreements which restrict the signor's ability to work for a competitor without regard to capacity have repeatedly been declared contrary to law"); *Cambridge Eng'g, Inc. v. Mercury Ptrs. 90 BI, Inc*., 378 Ill. App. 3d 437, 457-58, 879 N.E.2d 512, 517 (covenant not to "engage in any activity for or on behalf of [e]mployer's competitors, or engage in any business that competes with [e]mployer" is overbroad and unenforceable); *see also Océ N. Am.*, 2009 WL 6056775, at *8.

Although courts have discretion to "blue pencil" or modify overbroad anti-compete clauses, the Court agrees with Mr. Ward that doing so here, where the anti-compete clause is significantly overbroad in several ways, is not appropriate. As the Illinois Appellate Court and

courts in this District have recognized, modifying an extremely overbroad non-compete agreement could provide a disincentive for employers and employees to draft narrow and precise agreements. *See Oce N. Am.*, 2010 WL 5033310, at *10 ("[A] court should not modify an agreement that is patently unfair or requires 'drastic modifications' because doing so could 'discourag[e] the narrow and precise draftsmanship which should be reflected in written agreements.'") (quoting *Eichmann v. Nat'l Hosp. & Health Care Servs. Inc*., 308 Ill. App. 3d 337, 347-48, 719 N.E.2d 1141 (1st Dist. 1999)).

Significantly, even if the anti-compete clause is enforceable, Triumph has not established that it will suffer irreparable harm for which there is no adequate remedy at law if the Court does not issue the requested preliminary injunction. As the Court has stated repeatedly, Triumph and AGI are not direct competitors, and Triumph has not established that Mr. Ward is or is likely to solicit Triumph's customers or employees or use Triumph's trade secrets or confidential information in his new role at AGI or otherwise.

## CONCLUSION

For the reasons set forth above, the Court denies Triumph's motion for a preliminary injunction and vacates the November 8, 2011 Temporary Restraining Order.

**Date:** December 2, 2011

ENTERED

_____
**AMY J. ST. EVE**
**United States District Court Judge**