**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| TRIUMPH PACKAGING GROUP, an Illinois corporation, )<br><br>Plaintiff, )<br><br>v. )<br><br>SCOTT WARD, VITAL-X ASSOCIATES, LLC, an Illinois limited liability corporation, CREATIVE DESIGN PRODUCTS, INC., JOHN DOES, JANE DOES AND ABC COMPANIES, )<br><br>Defendants. )<br>_____ )<br><br>SCOTT WARD, and SCOTT WARD derivatively on behalf of TRIUMPH PACKAGING GROUP, an Illinois corporation, )<br><br>Counter-claimant and Third Party Plaintiff )<br><br>v. )<br><br>TCG PACKAGING SERVICES, LLC d/b/a/ TRIUMPH PACKAGING GROUP, RANDALL CECOLA, DTG SERVICES GROUP, INC., KALLAHAN MARKETING GROUP, INC., DARWIN TECHNOLOGY, TESORO REALTY GROUP LLC, and JOHN DOES, JANE DOES, and ABC COMPANIES, )<br><br>Counterclaim and Third Party Defendants. ) | Case No. 11-cv-7927 |

**MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, District Court Judge:

Plaintiff/Counter-Defendant Triumph Packaging Group ("Triumph") and Third-Party Defendants Randall Cecola ("Cecola"), DTG Services Group, Inc. ("DTG"), Kallahan Marketing Group, Inc. ("KMG"), Darwin Technology ("Darwin"), and Tesoro Realty Group LLC ("Tesoro Realty") (collectively, the "Third-Party Defendants") move to dismiss Defendant/Counter-Plaintiff Scott Ward's ("Ward") counterclaims pursuant to Federal Rules of Civil Procedure ("Rule") 12(b)(1) and 12(b)(6). For the following reasons, the Court grants the motion in part and denies it in part.

## PROCEDURAL BACKGROUND

On November 8, 2011, Triumph filed a seven-count Complaint against Scott Ward ("Ward"), Vital-X Associates, LLC ("Vital-X"), Creative Design Products, Inc. ("CDP"), John Does, Jane Does, and ABC Companies, alleging actual and threatened misappropriation of trade secrets, breach of contract, breach of fiduciary duty, violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), conversion, tortious interference with prospective economic advantage, and civil conspiracy. (R. 1, Compl.) Triumph moved for a temporary restraining order, which Judge Kennelly, in his capacity as Emergency Judge, granted on November 8, 2011. (R. 8, 9.) Triumph also moved for a preliminary injunction, which the Court denied on December 2, 2011, after conducting a hearing on the motion. *See Triumph Packaging Grp. v. Ward*, 834 F. Supp. 2d 796 (N.D. Ill. Dec. 2, 2011).[1]

---

[1] The Court's December 2, 2011 Memorandum Opinion and Order contains a detailed discussion of the underlying facts of Triumph's claims against Ward.

Ward answered the Complaint on January 4, 2012 and filed a Counterclaim and Third-Party Complaint, alleging claims individually and derivatively on behalf of Triumph. (R. 63.) In Count I, Ward, individually, brings a claim for fraudulent inducement against Cecola and Triumph. In Count II, Ward, individually and derivatively on behalf of Triumph, asserts a RICO violation, 18 U.S.C. § 1962(c), against Cecola, the Third-Party Defendants, as well as John Does, Jane Does, and ABC Companies (collectively, "All Defendants"). In Count III, Ward, derivatively on behalf of Triumph, brings a claim for breach of fiduciary duty against Cecola. Ward, individually and derivatively on behalf of Triumph, asserts a civil conspiracy claim against All Defendants in Count IV and a conversion claim against All Defendants in Count V.

## RELEVANT FACTS

Ward alleges the following facts in support of his claims, which the Court accepts as true for the purpose of this motion.[2] *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). Triumph is a privately-owned manufacturer of folding cartons. (R. 63, Countercl. ¶ 4.) Ward and Cecola are individuals who reside in and are citizens of Illinois. (*Id.* ¶¶ 5-6.) Ward is the former Chief Operating Offer of Triumph, and Cecola is Triumph's Chief Executive Officer. (*Id.* ¶¶ 16-17, 19.) DTG, Tesoro Realty, and KMG are Illinois corporations that Cecola owns and controls. (*Id.* ¶¶ 7-9.) Darwin is a business enterprise that Cecola also owns and controls. (*Id.* ¶ 10.)

After meeting in September 2004, Ward and Cecola decided to purchase a failing business, turn it around, and run it together. (*Id.* ¶¶ 22-35.) Cecola told Ward that he had

---

[2] Ward's Counterclaim consists of 385 enumerated paragraphs and contains numerous alleged facts that are immaterial and irrelevant to his asserted claims. In the interest of brevity, the Court sets forth here only the relevant allegations.

experience owning a temporary agency, but had no manufacturing or management experience.
(*Id.* ¶ 26.) Ward, on the other hand, had 15 years of experience running folding carton operations, and he also had manufacturing experience. (*Id.* ¶ 27.) Cecola told Ward to scope out a business and that they would be equal partners in any "deal they did." (*Id.* ¶ 32.)

In August 2005, a bank seized a company named Chapco Carton, and Cecola and Ward decided to purchase it via auction. (*Id.* ¶¶ 53-54.) They agreed to rename the business Triumph Packaging. (*Id.* ¶ 55.) At this time, Cecola told Ward that he had "an informal investment group of very private investors, called Trovare, that would be putting up the money for the purchase." (*Id.* ¶ 56.) He explained that Trovare "consisted of mostly Barrington and Willow Creek Church people that he had done business with in the past," but he refused to reveal the names of the Trovare investors. (*Id.* ¶¶ 57, 61.) Cecola also assured Ward that "as operators of Triumph . . . he and Ward would have equal agreements and matching ownership opportunity." (*Id.* ¶ 58.) Specifically, he explained that he and Ward would start out with 5% ownership rights of the company, with the potential of gaining an additional 5%, and that Trovare would own the remaining 90%. (*Id.* ¶ 59.)

Ward and Triumph met at a Palatine restaurant on August 15, 2005, at which time Cecola presented Ward with a partnership agreement and employment agreement. (*Id.* ¶ 67.) Ward was dissatisfied with the employment agreement and expressed tentativeness about the partnership. (*Id.* ¶¶ 68-69.) He did not sign the agreements at that time, and over the next week, he came to Cecola with several questions. (*Id.* ¶¶ 69-70.) Cecola reaffirmed to Ward that they were equal partners in the business, had the same deal, and would operate the company and make the day-to-day decisions. (*Id.* ¶¶ 71, 73, 75.) Following those representations, Ward "signed the

4

agreement with Cecola's assurance that he and Ward would be . . . equal partners." (*Id.* ¶ 77.) Ward and Cecola also agreed to take the same salary. (*Id.* ¶ 95.)  At an auction on September 6, 2005, Cecola and Ward purchased Chapco Carton, which became Triumph Packaging. (*Id.* ¶ 86.)

Ward "turned things around" quickly at Triumph. (*Id.* ¶¶ 89-90.)  Triumph earned a profit in its first month of new ownership and had its highest sales in two years. (*Id.* ¶ 91.)  At some point in 2006, Triumph became short on cash. (*Id.* ¶¶ 96-97.)  Ward began struggling to operate Triumph, and Cecola began spending less time at Triumph. (*Id.* ¶ 103.)  Ward became frustrated that Cecola was not holding up his end of the bargain and was not able to obtain financing for Triumph. (*Id.* ¶¶ 104-06.)  Triumph had a very bad year in 2006. (*Id.* ¶ 107.)

In the spring of 2007, Cecola questioned Ward as to why Triumph's raw material costs had risen. (*Id.* ¶ 109.)  In the process of investigating the answer, Ward learned from Triumph's controller, Jerry Poch, that Cecola had told him to send payments to Cecola's companies, DTG and Darwin, under the raw materials category to hide them. (*Id.* ¶¶ 110-13.)  When Ward confronted Cecola, he denied telling Poch to hide payments. (*Id.* ¶ 117.)  Instead, Cecola told Ward that the payments were to the Trovare investors to repay them for their initial $850,000.00 investment to purchase the company. (*Id.* ¶ 118.)  Later in 2007, Ward asked Poch how much money Triumph had paid toward the Trovare loan, and Poch told him that it had paid $900,000.00. (*Id.* ¶ 123.)  Poch told him that the principal balance on the loan was $650,000.00. (*Id.* ¶ 124.)  The principal balance had remained unchanged after an initial $200,000.00 payment in 2005. (*Id.* ¶ 125.)  Ward was very upset and confronted Cecola about the loan, to which Cecola responded that "it was just the deal with investors." (*Id.* ¶ 128.)

In June of 2007, Cecola suggested to Ward that he sign a new employment agreement. (*Id.* ¶ 170.) Cecola re-confirmed to Ward that they were equal partners and that they would have the same deal on any acquisitions that the company made. (*Id.* ¶ 169.) Ward and Cecola agreed that if Triumph added an additional plant, Ward's salary would increase. (*Id.* ¶ 173.) Ward "reluctantly" signed the new employment agreement. (*Id.* ¶ 174.)

In early 2008, Ward followed up with Poch regarding the status of the Trovare loan, and Poch told him that Triumph had paid $1,200,00.00 toward the $850,000.00 loan and that the principal balance was still $650,000.00. (*Id.* ¶ 161.) When Ward confronted Cecola about the loan at this time, Cecola's story changed. He explained that it was not really a loan, but a management fee. (*Id.* ¶¶ 163-64.) Ward and Cecola disagreed about whether paying management fees was appropriate since Ward and Cecola were managing Triumph. (*Id.* ¶¶ 165-66.) At this time, Triumph was paying DTG and Darwin approximately $30,000.00 per month in management fees. (*Id.* ¶ 167.)

In February 2008, Triumph was facing "huge cash flow problems" and was "having trouble paying its bills." (*Id.* ¶¶ 180, 192.) Around this same time, Cecola purchased a new $100,000.00 car. (*Id*. ¶ 186.) Ward learned around this time that Cecola did not turn in expense reports to Triumph, and that Triumph paid Cecola's companies "no matter what." (*Id*. ¶¶ 188, 190.)

In April 2008, Triumph "was in serious jeopardy of missing pay-roll payments to its employees." (*Id.* ¶ 197.) Ward called Cecola about the issue, and Cecola told Ward that "if the company has to miss payroll then the company will have to miss payroll." (*Id.* ¶ 200.) Ward then took out a second mortgage on his house and gave Triumph a check for $50,000.00 so that

Triumph could pay its employees. (*Id.* ¶¶ 202-203.) Cecola eventually repaid Ward, but Ward had to pay taxes on $10,000.00 of the loan repayment. (*Id.* ¶ 204-05.)

In May or June of 2008, Triumph acquired a second plant in Thomaston, Georgia. (*Id.* ¶ 212.) In the fall of 2008, Ward noticed that KMG was receiving checks from the Thomaston plant in the amount of $10,000.00 per month. (*Id.* ¶ 215.) Cecola told Ward that this was Thomaston's portion of the management fee for the Trovare Group investors. (*Id.* ¶ 216.)

In 2009, Triumph grew by 40%, but cash flow remained an issue. (*Id.* ¶¶ 225, 227.) Ward signed yet another employment agreement, which "outlin[ed] a new bonus arrangement" and an "additional 5% ownership" if "they met the performance criteria." (*Id.* ¶ 228.) Although Ward expected to get "a decent bonus," the company missed its goals due to its payment of the management fees. (*Id.* ¶¶ 230-31.) Ward did not receive a performance bonus, but he did receive a $10,000.00 bonus for securing new business. (*Id.* ¶ 232-33.)

In April 2011, Triumph received notice that it was the subject of an Internal Revenue Service ("IRS") audit. (*Id.* ¶ 304.) The IRS fined Triumph for an incorrect calculation on depreciation, and Triumph had to pay back taxes from 2008. (*Id.* ¶ 306.)

At some unidentified point in time, Ward learned that Cecola funneled money through those companies before forwarding it on to Trovare investors tax-free. (*Id.* ¶¶ 236-41.) In January 2011, Ward learned that Cecola owned Tesoro Realty, the company to which Triumph paid $35,000.00 per month in rent for the Thomaston plant. (*Id.* ¶¶ 275-77, 281.) On September 19, 2011, Cecola terminated Ward's employment. (*Id.* ¶ 327.)

## LEGAL STANDARD

### I.      Rule 12(b)(1)

The standard the Court employs on a Rule 12(b)(1) motion to dismiss for lack of subject

matter jurisdiction depends on the purpose of the motion.  *See Apex Digital, Inc. v. Sears,*

*Roebuck & Co.*, 572 F.3d 440, 443-44 (7th Cir. 2009); *United Phosphorus, Ltd. v. Angus Chem.*

*Co.*, 322 F.3d 942, 946 (7th Cir. 2003) (en banc), *overruled on other grounds by Minn-Chem,*

*Inc. v. Agrium, Inc*., --- F.3d ----, 2012 WL 2403531 (7th Cir. June 27, 2012).  If a defendant

challenges the sufficiency of the allegations regarding subject matter jurisdiction, the Court must

accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of

the plaintiff.  *See Apex Digital*, 572 F.3d at 443-44; *United Phosphorus*, 322 F.3d at 946.  If,

however, the defendant denies or controverts the truth of the jurisdictional allegations, the Court

may look beyond the pleadings and view any evidence submitted to determine if subject matter

jurisdiction exists.  *See Apex Digital*, 572 F.3d at 443-44*; United Phosphorus*, 322 F.3d at 946;

*see also St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 625 (7th Cir.

2007).  "Where jurisdiction is in question, the party asserting a right to a federal forum has the

burden of proof, regardless of who raises the jurisdictional challenge."  *Craig v. Ontario Corp*.,

543 F.3d 872, 876 (7th Cir. 2008).

### II.      Rule 12(b)(6)

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a

claim upon which relief may be granted."  *Hallinan v. Fraternal Order of Police of Chicago*

*Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009).  "The issue is not whether a plaintiff will

ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."

*AnchorBank*, 649 F.3d at 614 (internal quotation and citation omitted). Pursuant to Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)).

"In evaluating the sufficiency of the complaint, [courts] view it in the light most favorable to the plaintiff, taking as true all well-pleaded factual allegations and making all possible inferences from the allegations in the plaintiff's favor." *AnchorBank,* 649 F.3d at 614. "To survive a motion to dismiss, the complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face . . . . A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 934-35 (7th Cir. 2012) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (internal quotation marks omitted)). "The complaint 'must actually suggest that the plaintiff has a right to relief, by providing allegations that raise a right to relief above the speculative level.'" *Id.* at 935 (citing *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs.*, 536 F.3d 663, 668 (7th Cir. 2008)). "[A] plaintiff's claim need not be probable, only plausible: 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'" *Id.* (citing *Twombly*, 550 U.S. at 556 (internal quotation omitted)). "To meet this plausibility standard, the complaint must supply 'enough fact[s] to raise a reasonable expectation

9

that discovery will reveal evidence' supporting the plaintiff's allegations." *Id.* (citing *Twombly*, 550 U.S. at 556).

## III.    Rule 9(b)

In pleading fraud in federal court, Rule 9(b) imposes a higher pleading standard than that required under Rule 8. *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 446 (7th Cir. 2011). Specifically, Rule 9(b) requires a pleading to state with particularity the circumstances constituting the alleged fraud. *See* Fed. R. Civ. P. 9(b); *Pirelli*, 631 F.3d at 441-42. This "ordinarily requires describing the 'who, what, when, where, and how" of the fraud, although the exact level of particularity that is required will necessarily differ based on the facts of the case." *AnchorBank*, 649 F.3d at 615 (citation omitted); *see also Pirelli*, 631 F.3d at 441-42. "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally," however. Fed. R. Civ. P. 9(b). "[T]he particularity requirement of Rule 9(b) is designed to discourage a 'sue first, ask questions later' philosophy." *Pirelli*, 631 F.3d at 441 (citation omitted).

## ANALYSIS

## I.    Ward Does Not Have Standing to Sue On Behalf of Triumph (Counts II-V)

Ward, both individually and derivatively on behalf of Triumph, brings Counts II, IV, and V. Ward brings Count III derivatively on behalf of Triumph. Triumph and the Third-Party Defendants contend that because Ward does not have standing to sue derivatively on behalf of Triumph, the Court should dismiss Ward's derivative claims in Counts II, IV, and V, as well as Count III in its entirety, for lack of subject matter jurisdiction.

A derivative suit brought by a shareholder allows the shareholder "'to enforce a *corporate* cause of action against officers, directors, and third parties.'" *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 95, 111 S. Ct. 1711, 114 L. Ed. 2d 152 (1991) (quoting *Ross v. Bernhard*, 396 U.S. 531, 534, 90 S. Ct. 733, 24 L. Ed. 2d 729 (1970) (emphasis in original)). The Seventh Circuit has held that pursuant to Rule 23.1, "a plaintiff in a derivative action must maintain his shareholder status throughout the pendency of the lawsuit, and an action will abate if the plaintiff loses his shareholder status before the litigation ends." *Portnoy v. Kawecki Berylco Indus., Inc.*, 607 F.2d 765, 767 (7th Cir. 1979) (citing *Schilling v. Belcher*, 582 F.2d 995 (5th Cir. 1978) and *Tryforos v. Icarian Dev. Co.*, 518 F.2d 1258 (7th Cir. 1975), *cert. denied*, 423 U.S. 1091, 96 S. Ct. 887, 47 L. Ed. 2d 103 (1976)); *see also Carlstead on Behalf of Kay Corp. v. Holiday Inns, Inc.*, No. 86 C 1927, 1986 WL 11680, at *13-14 (N.D. Ill. Oct. 9, 1986) (dismissing former shareholder's derivative claims for lack of standing) (quoting *Portnoy*, 607 F.2d at 767); *Issen v. GSC Enters., Inc.*, 538 F. Supp. 745, 752 (N.D. Ill. 1982) (same). In *Schilling*, which the Seventh Circuit cited with approval in *Portnoy*, the Fifth Circuit explained that "[s]tanding [to bring a derivative action on behalf of a corporation] is justified only by the proprietary interest created by the stockholder relationship and the possible indirect benefits the nominal plaintiff may acquire qua stockholder of the corporation which is the real party in interest." *Schilling*, 582 F.2d at 1002 (quoting *Kauffman v. Dreyfus Fund, Inc.*, 434 U.S. 727, 735-736 (3rd Cir. 1970), *cert. denied*, 401 U.S. 974, 91 S. Ct. 1190, 28 L. Ed. 2d 323 (1971)).

Ward argues that the Court should ignore the Seventh Circuit's decision in *Portnoy* on the grounds that its rationale–ensuring that the interests of the plaintiff remain aligned with other similarly-situated shareholders–does not apply here because Triumph is a closely-held

11

corporation.  (R. 88, Ward Resp. at 3.)  Ward cites no legal authority to support this distinction, and indeed courts have rejected this very argument.  *See Small v. Sussman*, 306 Ill. App. 3d 639, 6434, 713 N.E.2d 1216 (Ill. App. 1st Dist. 1999) (rejecting argument that Illinois should allow "minority shareholders the right to bring a direct action against co-shareholders [for injury to the corporation] when the corporation is closely held"); *see also Frank v. Hadesman and Frank, Inc.*, 83 F.3d 158, 160-62 (7th Cir. 1996) ("Illinois follows the widespread rule that an action for harm to the corporation must be brought in the corporate name.").[3]  The Court is bound by Seventh Circuit precedent, and Ward provides no basis to ignore *Portnoy*.  Therefore, in order for Ward to have standing to sue derivatively on behalf of Triumph, he must be a current shareholder of Triumph.

Ward alleges that he "has standing to bring this action derivatively on behalf of Triumph by virtue of him being a shareholder."  (Countercl. ¶ 18.)  Triumph and the Third-Party Defendants, however, contest the veracity of this allegation.  Specifically, they assert that Ward is no longer a shareholder of Triumph.  Accordingly, the Court may look beyond the allegations to determine whether Ward has standing, and thus whether the Court has subject matter jurisdiction over his derivative claims.  *See Apex Digital*, 572 F.3d at 444 (acknowledging that on a Rule 12(b)(1) motion attacking the factual basis for jurisdiction, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims").

Triumph and the Third-Party Defendants have submitted evidence demonstrating that Ward is no longer a shareholder of Triumph.  Specifically, Ward's employment agreement with

---

[3]  The parties agree that Illinois law applies to their respective state-law claims.

Triumph provides that "[Ward] covenants and agrees that [he] may own the Shares only for so long as [he] is employed by the Company."  (R. 78-1, Employment Agreement § 4(a).)  He also agreed that in the event Triumph terminated his employment "for any reason," he would "convey, transfer, and sell back to [Triumph]" all of his Triumph stock.  (*Id.* ¶ 4(c)(ii).)  Ward does not dispute that Triumph terminated his employment in September 2011.  (Countercl. ¶ 327.)  On October 19, 2011, Triumph, through its counsel, requested Ward to tender his shares back to Triumph pursuant to Ward's employment agreement.  (R. 78-2, Email from Bart Lazar to Blake Hannafan, dated Oct. 19, 2011.)  Because Ward did not tender the shares back to Triumph in accordance with his employment agreement, Triumph deemed his shares cancelled as of September 20, 2011.  (R. 78-3, Letter from Bart Lazar to Blake Hannafan, dated Nov. 23, 2011.)

In response, Ward argues, without any evidentiary support, that he did not turn over or otherwise sell his shares in Triumph and that it would be "inappropriate for the Court to decide at this stage whether [his] shares were actually surrendered."  (Ward's Resp. at 4.)  Ward submits no evidence in support of this assertion, instead relying on his general allegations in his counterclaim.  Although Ward alleges in his counterclaim that Triumph improperly terminated him (and therefore improperly cancelled his shares), that allegation, even if true, does not change the fact that Ward is no longer a shareholder and would not benefit from any recovery to Triumph in this litigation.  *See Issen*, 538 F. Supp. at 752 n.11 (rejecting the plaintiff's argument that the reasoning in *Portnoy* does not apply when the plaintiff "has not voluntarily disposed of his shares" because the involuntary nature of the share disposal "does not . . . alter the fact that plaintiff will not benefit, even indirectly, from a favorable result"); *see also Frank*, 83 F.3d at 160 (noting that a "shareholder-employee who contests his discharge from employment" suffers

13

a personal, not corporate, injury and that "[t]he investor whose certificates are sequestered suffers an injury unrelated to the firm"). Accordingly, even if the Court determined that Triumph improperly terminated Ward, it would not confer standing on Ward to sue on behalf of Triumph. Because Ward is no longer a shareholder of Triumph, he does not have standing to sue on its behalf. Count III (breach of fiduciary duty) and Ward's derivative claims in Counts II (RICO), IV (civil conspiracy), and V (conversion) are dismissed with prejudice.

## II.    RICO

Triumph and the Third-Party Defendants move to dismiss Ward's RICO claim for lack of standing under Rule 12(b)(1) and failure to state a claim under Rule 12(b)(6). The Court addresses each argument in turn.

### A.    Based On His Allegations, Ward Does Not Have Standing To Pursue a Civil RICO Claim

Triumph and the Third-Party Defendants argue that Ward does not have standing to pursue his RICO claim individually because the injury he alleges is a corporate, not a personal, injury. (R. 78, Mem. in Supp. of Mot. to Dismiss at 5-6.) "The civil RICO cause of action arises under 18 U.S.C. § 1964(c)." *RWB Servs., LLC v. Hartford Computer Grp., Inc.*, 539 F.3d 681, 685 (7th Cir. 2008). Section 1964(c) provides that

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

18 U.S.C. § 1964(c). Section 1964(c) requires a civil RICO plaintiff to plead three things: "(1) an 'injur[y] in [its] business or property'; (2) 'by reason of'; (3) the defendants' 'violation of section 1962.'" *RWB Servs.*, 539 F.3d at 685 (quoting 18 U.S.C. § 1964(c)).

14

"The phrase 'injured in business or property' [in § 1964(c)] has been interpreted as a standing requirement–rather than an element of the cause of action–which must be satisfied in order to prevail on a RICO claim." *Evans v. City of Chicago*, 434 F.3d 916, 924 (7th Cir. 2006) (citation omitted); *see also LaFlamboy v. Landek*, 587 F. Supp. 2d 914, 935-36 (N.D. Ill. 2008). Likewise, "the causation component of § 1964(c)–whether an alleged RICO injury was caused 'by reason of' a violation of the statute–has also been considered a component of standing." *Evans*, 343 F.3d at 924 (citations omitted); *RWB Servs.,* 539 F.3d at 686; *see also Anza v. Ideal Steel Supply Corp*., 547 U.S. 451, 126 S. Ct. 1991, 164 L. Ed. 2d 720 (2006) (holding that a plaintiff does not have standing to sue for a civil RICO violation unless its injury was proximately caused by the alleged violation).

In his RICO counterclaim, Ward alleges that Triumph and the Third-Party Defendants "engaged in a collective and common course of action to divert opportunities and resources from Triumph" and that they used "fraud and artifice to unlawfully obtain Triumph's assets . . . ." (Countercl. ¶¶ 346-47, 355.) He further alleges that "[a]s a result of the Counterclaim and Third-Party Defendants' acts, Triumph suffered damages in an amount to be determined at trial" and that Cecola siphoned money away from Triumph that "should have inured to Ward's benefit . . . as a shareholder." (*Id.* ¶¶ 358, 360.) From these allegations, it is clear that Ward is attempting to recover damages that *Triumph* incurred. *See Gagan v. Am. Cablevision, Inc*., 77 F.3d 951, 959 (7th Cir. 1996) ("Where the shareholder's injury resulted directly from an injury to the corporation, but only indirectly from the harm the wrongdoer wreaked upon the corporation, the RICO claim belongs to the corporation, and not the shareholder.") (citations omitted); *Sears v. Likens*, 912 F.2d 889, 892 (7th Cir. 1990) ("Shareholders of a corporation do not have standing

as individuals to bring a RICO action for diminution in the value of their stock caused allegedly by racketeering activities conducted against the corporation."). As the Court has already determined, however, Ward does not have standing to assert RICO claim on behalf of Triumph.

Ward argues in his opposition brief that he also individually suffered damages by not receiving 1) interest on the $50,000.00 loan he made to Triumph and 2) his performance bonus. (R. 88, Ward Opp. at 4-5.) Ward's Counterclaim, however, lacks any allegations that he was ever entitled to receive interest on the loan that he voluntarily made to Triumph. Therefore, his assertion of lost interest does not confer individual standing on him. With respect to his lost performance bonus, Ward alleges in his Counterclaim that he signed a new employment agreement "outlining a new bonus arrangement," and that he "expected to get a decent bonus," but that he did not receive a bonus because "[t]he company missed its goals" as a result of Cecola paying out management fees each month. (Countercl. ¶¶ 228, 230-31.) He further pleads that each of Cecola's payments to companies that he controlled "was an act of fraud, in that it was represented to have been a legitimate business expense, when in fact, it was Cecola siphoning away funds that should have inured to Ward's benefit as an officer with a performance bonus plan . . . ." (Id. ¶ 358.)

Although the Seventh Circuit has recognized the possibility that the loss of an employee's "promised or contracted for wages" may constitute "injury to 'business or property'" within the meaning of § 1964(c), *see Evans*, 434 F.3d at 928,[4] Ward has not alleged that his

---

[4] The Seventh Circuit cited *Williams v. Mohawk Indus., Inc.*, 411 F.3d 1252, 1260 (11th Cir. 2005) in support of this statement, which the Supreme Court subsequently vacated and remanded in light of *Anza* after the Seventh Circuit issued its opinion in *Evans*. On remand, the Eleventh Circuit held that plaintiff employees sufficiently alleged injury to business or property proximately caused by the alleged RICO violations. *See Williams v. Mohawk Indus., Inc.*, 465

performance bonus constitutes "promised or contracted for wages" or other property right.  *Id.*

The Court cannot determine, for example, whether the bonus was mandatory or discretionary, or

whether Ward met the prerequisites, if any, for eligibility to receive such a bonus.  Ward's

allegation that he did not receive a bonus that he "expected to get" is insufficient to state a claim

for injury to his "business or property."  *See id.* at 932 ("[E]very court that has addressed this

issue has held that injuries proffered by plaintiffs in order to confer RICO standing must be

'concrete and actual,' as opposed to speculative and amorphous.") (citing cases).

Ward also fails to allege that the RICO violations proximately caused his lost

performance bonus injury.[5]  *See RWB Servs.*, 539 F.3d at 686 (holding that, in order to have

standing, a civil RICO plaintiff "must prove, among other things, that the 'pattern of

racketeering activity' . . . proximately caused its 'injur[y]'") (quoting *Holmes v. Secs. Inv.*

*Protection Corp.*, 503 U.S. 258, 268, 112 S. Ct. 1311, 117 L. Ed. 2d 532 (1992)); *see also*

*Williams*, 465 F.3d at 1287 ("*Anza* makes clear that courts should scrutinize proximate causation

at the pleading stage and carefully evaluate whether the injury pled was proximately caused by

the claimed RICO violations.").

"In examining whether a RICO violation proximately caused the plaintiff's injury, 'the

central question . . . is whether the alleged violation led *directly* to the plaintiff's injuries.'"

---

F.3d 1277, 1287 (11th Cir. 2006), *cert. denied*, 549 U.S. 1260, 127 S. Ct. 1381, 167 L. Ed. 2d
174 (2007).

[5]  The parties largely fail to address the causation portion of § 1964(c).  Because it is
relevant to standing, and thus the Court's jurisdiction, the Court addresses it *sua sponte*.  *See*
*RWB Servs.*, 539 F.3d at 685 (noting that whether a civil RICO plaintiff's injury occurred "by
reason of" the alleged RICO violation relates to the plaintiff's standing and is therefore
jurisdictional).

*RWB Servs.*, 539 F.3d at 688 (quoting *Anza*, 547 U.S. at 461) (emphasis added).  The Seventh

Circuit has explained that

> Saying that the injury to the plaintiff is 'direct' is akin to saying that the victim
> was reasonably foreseeable, the traditional principle for hemming in tort liability.
> Such directness obviates the difficulty in assessing damages from indirect
> injuries; avoids complicated rules for apportioning damages among several
> injured parties with greater or lesser injuries; and provides the requisite level of
> deterrence for RICO tortfeasors.

*Id.* (citing *Holmes*, 503 U.S. at 270).

Based on Ward's allegations, the victim of the RICO violation was Triumph, and Ward's

performance bonus injury, which he incurred as an employee of Triumph, was, at most, an

indirect result of the alleged injury to Triumph.  (Countercl. ¶¶ 228-231 (alleging that "[t]he

company missed its goals," because of Cecola's payments to his companies and that Ward did

not receive a performance bonus).)  Courts have recognized that employees who suffer indirect

injuries as a result of conduct aimed at the employer do not have standing under RICO.  *See, e.g.*,

*Mid-State Fertilizer Co. v Exchange Nat'l Bank of Chicago*, 693 F. Supp. 666, 673 (N.D. Ill.

1988) (noting that the plaintiff-employees "cannot rely on the indirect injury they suffer as a

result of their being shareholders and employees of a corporation that suffers direct injury");

*Manson v. Stacescu*, 11 F.3d 1127, 1132 (2d Cir. 1993) (holding that the employee of a bankrupt

corporation did not have standing under RICO where the scheme was directed at the company

because any injury sustained by the employee was an "indirect result" of the injury to the

company); *Willis v. Lipton*, 947 F.2d 998, 1000 (1st Cir. 1991) (holding that the employee of a

bankrupt corporation did not have standing under RICO to recover injuries, including loss of

employment, because his injury "plainly was incidental to the corporation's injury") (citation

and internal quotation marks omitted) (quoting *Warren v. Mfrs. Nat'l Bank of Detroit*, 759 F.2d

542, 545 (6th Cir. 1985)).  Because Ward has alleged only an indirect injury, he has failed to allege RICO standing.

**B.     Ward Fails to State a RICO Claim**

Ward's RICO claim fails not only for lack of standing, but also for failure to state a claim.  "RICO . . . does not cover all instances of wrongdoing.  Rather, it is a unique cause of action that is concerned with eradicating organized, long-term, habitual criminal activity." *Gamboa v. Velez*, 457 F.3d 703, 705 (7th Cir. 2006) (citations omitted); *see also Kaye v. D'Amato*, 357 Fed. App'x 706, 710 (7th Cir. 2009) (noting that RICO "focuses on the limited purpose of 'eradicating organized, long-term, habitual criminal activity'") (quoting *Gamboa*, 457 F.3d at 705)).

Ward asserts that Triumph and Third-Party Defendants violated RICO, 18 U.S.C. § 1962(c), which "makes it a crime for 'any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.'"  *Wilkie v. Robbins*, 551 U.S. 537, 563, 127 S. Ct. 2588, 168 L. Ed. 2d 389 (2007); *see also Rao v. BP Prods. N. Am., Inc*., 589 F.3d 389, 399 (7th Cir. 2009). "A claim under section 1962(c) . . . requires a plaintiff to demonstrate (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *Rao*, 589 F.3d at 399.  Although Triumph and Third-Party Defendants argue that Ward has failed to "properly allege any of the elements of a RICO claim," they set forth substantive arguments only as to elements (2), (3), and (4) above.  They have thus waived any challenge to the sufficiency of Ward's allegations regarding the first element.  *See Appert v. Morgan Stanley Dean Witter, Inc*., 673 F.3d 609, 617

19

n. 1 (7th Cir. 2012) (holding that "perfunctory and undeveloped arguments unsupported by pertinent authority are waived").

### 1.       Enterprise

The RICO statute defines an "enterprise" as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.'" *Boyle v. United States*, 556 U.S. 938, 944, 129 S. Ct. 2237, 173 L. Ed. 2d 1265 (2009) (citing 18 U.S.C. § 1961(4)).  A RICO enterprise is not limited to "business-like entities," but rather requires "an ongoing organization, formal or informal" that "function[s] as a continuing unit." *Id.* at 945, 950 (quoting *United States v. Turkette*, 452 U.S. 576, 580, 101 S. Ct. 2524, 69 L. Ed. 2d 246 (1981)).  "[A]n association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to continue to pursue the enterprise's purpose." *Id.* at 946; *see also Rao*, 589 F.3d at 399.  It does not require "a structural hierarchy, role differentiation, a unique modus operandi, a chain of command, professionalism and sophistication of organization, diversity and complexity of crimes, membership dues, rules and regulations, uncharged or additional crimes aside from predicate acts, an internal discipline mechanism, regular meetings regarding enterprise affairs, an enterprise name, [or] induction or initiation ceremonies and rituals." *Boyle*, 556 U.S. at 948 (internal quotation marks omitted).

Ward's allegations regarding the "enterprise" are as follows.  The "enterprise" consists of DTG, Darwin Technology, KMG, and Tesoro Realty, all of which Cecola owns and controls. (Countercl. ¶¶ 7, 9-10, 348.)  Triumph paid management fees to DTG, Darwin, and KMG, and Cecola funneled money through those companies to give tax-free payments to investors.  (*Id.*

¶¶ 164-167, 216, 241.)  Tesoro Realty is the landlord of Triumph's Thomaston plant, and

Triumph paid $35,000.00 per month in rent to Tesoro Realty.  (*Id.* ¶¶ 8, 275-77, 281.)  Since

2007, Cecola, DTG, Tesoro Realty, Darwin Technology, and KMG have "engaged in a

collective and common course of action to divert opportunities and resources from Triumph,

obtain kickbacks from vendors, and to assist Cecola and Tesoro Realty, KMG, Darwin

Technology, and DTG, in other business opportunities."  (*Id.* ¶ 346.)  Pursuant to *Boyle*, these

allegations are sufficient to infer the existence of a RICO enterprise.  556 U.S. at 946-948.

### 2. Pattern of Racketeering Activity

"A pattern of racketeering activity consists, at a minimum, of two predicate acts of

racketeering committed within a ten-year time period."  *Bressner v. Ambroziak*, 379 F.3d 478,

482 (7th Cir. 2004) (quoting *Goren v. New Vision Int'l, Inc*., 156 F.3d 721, 728 (7th Cir. 1998));

*see also* 18 U.S.C. § 1961(5).  Ward alleges the predicate acts are wire and mail fraud.  *See* 18

U.S.C. §§ 1341, 1343; Countercl. ¶¶ 353, 356-57, 359.

Because the alleged predicate acts are based in fraud, Ward's allegations must meet Rule

9(b)'s heightened pleading requirements.  *Kaye*, 357 Fed. App'x at 710 ("Allegations of fraud in

a civil RICO claim are subject to the heightened pleading standard set forth in Federal Rule of

Civil Procedure 9(b), which requires a plaintiff to plead all allegations of fraud with

particularity.") (citation omitted).  "An act of wire fraud requires a showing that (1) Defendants

participated in a scheme to defraud; (2) Defendants intended to defraud; and (3) Defendants used

wires in furtherance of the fraudulent scheme."  *Id*. (citation omitted).  The first and second

elements are the same for mail fraud, but the third element requires that the defendants used or

caused the use of the mails in furtherance of the fraudulent scheme.  *See United States v. Boone*,

628 F.3d 927, 933 (7th Cir. 2010).

Ward's Counterclaim is completely devoid of any allegations regarding Triumph or the Third-Party's use of the mails or wires in furtherance of the allegedly fraudulent scheme. Indeed, Ward appears to concede as much in his opposition by failing to cite to any allegations in support of his wire and mail fraud assertions. As such, his RICO claim fails on this ground in addition to the other grounds stated above.

For the reasons explained above, the Court dismisses Ward's RICO claim under Rule 12(b)(1) and Rule 12(b)(6) without prejudice.

## III.    Civil Conspiracy

Under Illinois law, a claim for civil conspiracy consists of six elements: (1) an agreement; (2) by two or more persons; (3) to perform an overt act or acts; (4) in furtherance of the agreement/conspiracy; (5) to accomplish an unlawful purpose or a lawful purpose by unlawful means; and (6) that causes injury to another. *Bressner*, 379 F.3d at 483 (citing *Nichols Motorcycle Supply, Inc. v. Dunlop Tire Corp.*, No. 93-C-5578, 1994 WL 698486, at *3 (N.D. Ill. Dec. 12, 1994)); *see also Karas v. Strevell*, 227 Ill.2d 440, 466, 318 Ill. Dec. 567, 466, 884 N. E. 2d 122 (Ill. 2008) ("Civil conspiracy consists of a combination of two or more persons for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means."). "The overt acts must be tortious or unlawful acts." *Bressner*, 379 F.3d at 483 (citing *Adcock v. Brakegate, Ltd.*, 164 Ill.2d 54, 206 Ill. Dec. 636, 645 N. E. 2d 888, 894 (1994)).

Ward's conspiracy allegations are woefully inadequate and constitute a mere recitation of the elements of the claim. Ward, for example, does not allege any facts regarding an agreement

22

or who the parties to such an agreement were. Moreover, Ward fails to allege any injury that he suffered, as opposed to injury that Triumph suffered, as a result of the alleged conspiracy. (Countercl. ¶¶ 371-73.) As such, his civil conspiracy claim is dismissed without prejudice. *See Iqbal*, 556 U.S. at 681.

## IV. Fraudulent Inducement

Under Illinois law, a claim for fraudulent inducement must aver "(1) a false statement of material fact; (2) known or believed to be false by the person making it; (3) an intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance." *Hoseman v. Weinschneider*, 322 F.3d 468, 476 (7th Cir. 2003) (citation omitted); *Cotter v. Parrish*, 166 Ill. App. 3d 836, 117 Ill. Dec. 821, 520 N. E. 2d 1172, 1175 (Ill. App. 5th Dist. 1988). Additionally, the pleader must allege that his belief in the false statement and reliance thereon was reasonable. *Regensburger v. China Adoption Consultants*, *Ltd.*, 138 F.3d 1201, 1207 (7th Cir. 1998) (citing *Phil Dressler & Assocs., Inc. v. Old Oak Brook Inv. Corp.*, 192 Ill. App. 3d 577, 139 Ill. Dec. 629, 633, 548 N. E. 2d 1343, 1347 (1989)). Finally, the allegations must meet Rule 9(b)'s heightened pleading standards. *See Pirelli*, 632 F.3d at 446-47 (explaining that Rule 9(b) applies to allegations of fraud); *Lululemon USA, Inc. v. 108 N. State Retail, LLC*, No. 09 C 1560, 2009 WL 1732103, at *2 (N.D. Ill. June 17, 2009) (dismissing the plaintiff's fraudulent inducement claim for failure to plead with particularity).

Cecola and Triumph move to dismiss Ward's fraudulent inducement claim, arguing that Ward's allegations are insufficient under Rules 8 and 9(b). They contend that Ward has failed to adequately allege that (1) Cecola made a false statement of material fact; (2) Ward relied on any

false statement or that such reliance was reasonable; and (3) Ward sustained any damage resulting from his reliance on Cecola's allegedly false statements. (Mem. in Supp. of Mot. to Dismiss at 8.)

### A. False Statement of Material Fact

As a general matter, "under Illinois law, statements regarding future events or circumstances are not a basis for fraud. Such statements are regarded as mere expressions of opinion or mere promises or conjectures upon which the other party has no right to rely." *Hoffman v. Nationwide Mut. Ins. Co.*, No. 10-CV-3841, 2011 WL 3158708, at *7 (N.D. Ill. Jul. 26, 2011) (quoting *Madison Assocs. v. Bass*, 158 Ill. App. 3d 526, 110 Ill. Dec. 513, 511 N. E. 2d 690, 699 (Ill. App. 1st Dist. 1987) (internal citations omitted)); *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc*., 131 Ill.2d 145, 168, 137 Ill. Dec. 19, 545 N. E. 2d 672 (1989). Illinois courts recognize an exception to this rule, however, where "the false promise or representation of future conduct is alleged to be the scheme employed to accomplish the fraud." *HPI*, 131 Ill. 2d at 168-69 (citation omitted); *Steinberg v. Chicago Med. School*, 69 Ill.2d 320, 334, 13 Ill. Dec. 699, 371 N. E. 2d 634 (1977); *see also Chatham Surgicore, Ltd. v. Health Care Serv. Corp*., 356 Ill. App. 3d 795, 804, 292 Ill. Dec. 534, 826 N. E. 2d 970 (Ill. App. 1st Dist. 2005); *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 570 (7th Cir. 2012). Cecola and Triumph argue that the false statement upon which Ward allegedly relied was a statement regarding a future event–namely, "that Ward and Cecola would be 'equal partners' at some point in the future'–and is therefore not actionable. (Mem. in Supp. of Mot. to Dismiss at 8.) Cecola's and Triumph's argument fails for several reasons.

24

Cecola's statements to Ward regarding the pair's equal partnership arguably speaks to a present, not a future, fact. Ward alleges that Cecola told him that they "were" equal partners and that they "had" the same deal. (Countercl. ¶ 71.) Given the tense of those assertions, it is reasonable to infer that Cecola led Ward to believe that they were equals in the venture at the time Cecola made that statement. Even if Cecola's statements regarding equal partnership referred to the future and not the present, however, Cecola's and Triumph's argument still fails because Cecola's statements fall within the exception to the general rule in Illinois, as explained above. *See HPI*, 131 Ill. 2d at 168-169. Ward specifically alleges that Cecola misled him about being equal business partners to convince him to join the business operation, at which point Cecola would "use Ward's business expertise and experience to make money for Triumph and Cecola." (Countercl. ¶ 335.) Indeed, Ward alleges that Triumph's bank told the pair that but for Ward's involvement, it would not have extended a loan to Triumph. (*Id.* ¶ 94.) Those allegations, combined with the remaining allegations in the Counterclaim regarding Cecola's false statements, support a plausible inference that Cecola's misrepresentations were part of a fraudulent scheme to gain Ward's partnership and personally benefit off of Ward's knowledge by misappropriating funds to himself. (*Id.* ¶¶ 191, 216, 291, 329-336); *see generally Wigod*, 673 F.3d at 570 ("Illinois courts have found as few as two broken promises enough to establish a scheme to defraud.") (citing cases); *Desnick v. Am. Broadcasting Cos., Inc.*, 44 F.3d 1345, 1355 (7th Cir. 1994) (holding that "promissory fraud is actionable only if it either is particularly egregious or, what may amount to the same thing, it is embedded in a larger pattern of deceptions or enticements that reasonably induces reliance and against which the law ought to provide a remedy").

Furthermore, Cecola's and Triumph's argument focuses on only one of Cecola's alleged false statements and neglects to account for Ward's allegations regarding Cecola's remaining false statements. In addition to alleging that Cecola assured Ward they would be equal partners, Ward avers that Cecola "falsely represented to Ward that Trovare was an independent group of investors that would provide funding to Triumph," when in reality, Cecola was involved with Trovare and profited from the "management fee[s]" that Trovare charged in connection with Triumph. (*Id.* ¶¶ 161-67, 330-332.) Cecola's representation regarding Trovare was not a statement of "future events or circumstances," but rather was a "representation[ ] of past or existing facts" because it portrayed Trovare's existing nature and willingness to support the endeavor as of the time of the statement. *See Hoffman*, 2011 WL 3158708, at *7. Likewise, Ward alleges that Cecola made false statements about the nature of the payments that Cecola made using Triumph's funds. (Countercl. ¶¶ 109-13, 118-21, 160-67 237-38, 281, 291.) These, too, were statements of past or existing facts. Accordingly, Ward has adequately alleged several false statements of material fact.

### B. Reasonable Reliance on the False Statement

Cecola and Triumph argue that Ward insufficiently alleges that he relied on any of Cecola's allegedly false representations or that his reliance was reasonable. (Mem. in Supp. of Mot. to Dismiss at 8.) First, they contend that Ward fails to allege that he acted in reliance on Cecola's allegedly false statements. Second, they argue that even he had done so, his reliance was not reasonable in light of the terms of his employment contract and employment experience at Triumph. (*Id.* at 8.) The Court disagrees with both of Cecola's and Triumph's arguments.

Ward alleges that he acted in reliance on Cecola's false statement when he avers that "[f]ollowing these representations [regarding the partners' business equality and Cecola's description of Trovare], Ward finally signed the [employment contract] with Cecola's assurance that he and Ward would be locked arm in arm in fighting the battle together as equal partners." (Countercl. ¶ 77.) Construing the allegations in Ward's favor, as the Court must do on a Rule 12(b)(6) motion, it is reasonable to infer that his willingness to sign the employment contract and join Triumph was based, at least in part, on Cecola's alleged false statements regarding the equal partnership and Trovare's independence.[6]

The Court also rejects Cecola's and Triumph's argument that Ward's reliance on Cecola's allegedly false statements was not reasonable as a matter of law. In the Seventh Circuit, whether reliance was reasonable is ordinarily a question of fact that courts may determine as a matter of law only when "no trier of fact could find that it was reasonable to rely on the alleged statements or when only one conclusion can be drawn." *Cozzi Iron & Metal, Inc. v. U.S. Office Equip., Inc.*, 250 F.3d 570, 574 (7th Cir. 2001) (citing *Neptuno Treuhand-Und Verwaltungsgesellschaft Mbh v. Arbor*, 295 Ill. App. 3d 567, 229 Ill. Dec. 823, 692 N. E. 2d 812, 819 (Ill. App. 1st Dist. 1998)). In determining reasonableness, Illinois law directs courts to ask whether the plaintiff had a right to rely on the statement in light of the surrounding facts. *See Cozzi Iron*, 250 F.3d at 574 ("we must consider all of the facts that [plaintiff] knew, as well as

---

[6] In his response brief, Ward also contends that he relied on Cecola's false statement regarding the nature of payments that Cecola made using Triumph's funds. (Ward's Resp. at 9.) Ward argues that Cecola made such misrepresentations "so that [Ward] would continue working, not demand additional shares, bonuses, or equal distributions, which he otherwise would have." (*Id*.) Ward, however, fails to cite to any allegations in the Counterclaim that support this argument. Although, as explained above, Ward has adequately alleged that these statements were false, Ward does not sufficiently plead reliance on those statements.

those facts [plaintiff] could have learned through the exercise of ordinary prudence").

The Court cannot determine, at this stage in the litigation, that "no trier of fact could find that it was reasonable [for Ward] to rely on the alleged statements" or that "only one conclusion can be drawn." *Id.* Cecola and Triumph argue that Ward's reliance on Cecola's allegedly false statements was unreasonable in light of the employment contract that Ward signed, which contains an "integration clause."[7] *See generally Kennedy v. Venrock Assocs.*, 348 F.3d 584, 592 (7th Cir. 2003) ("[R]eliance cannot be reasonable when it presupposes a failure to read clear language.") (citations omitted). That clause (the "Integration Clause") provides as follows:

> Complete Agreement. This Agreement, those documents expressly referred to herein and other documents of even date herewith embody the complete agreement and understanding among the parties and supersede and preempt any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way, but excluding any breaches thereof by either party prior to the date hereof.

(Employment Agreement § 16.)

Contrary to Cecola's and Triumph's argument, the Integration Clause does not bar Ward's reasonable reliance on Cecola's allegedly false statements. (Mem. in Supp. of Mot. to Dismiss at 9.) In Illinois, standard integration clauses do not preclude fraud claims. *See*

---

[7] Cecola and Triumph attached the employment contract to their memorandum in support of their motion to dismiss. Although Courts generally may not consider matters outside the pleadings on a Rule 12(b)(6) motion, an exception exists for documents that are referred to in the Complaint and that are "concededly authentic," and "central to the [party's] claim." *See Santana v. Cook County Bd. of Review*, 679 F.3d 614 (7th Cir. 2012). Ward refers to the employment contract throughout his Counterclaim. (*See, e.g.*, Countercl. ¶¶ 77, 173.) He does not dispute its authenticity, nor does he argue that the Court cannot consider it. Moreover, the Court has already examined, and relied on, the employment contract in its decision denying Triumph's and Cecola's motion for a preliminary injunction. *See Triumph*, 834 F. Supp. 2d at 814-16. In the interest of consistency and in accord with Seventh Circuit precedent, the Court will consider the employment contract.

*Vigortone Ag Prod., Inc. v. PM AG Prod., Inc.*, 316 F.3d 641, 644 (7th Cir. 2002). So-called "no-reliance" clauses, however, do preclude fraudulent inducement claims because they inherently disprove reasonableness. *Id.*; *see also Aeroground, Inc. v. CenterPoint Props. Trust*, No. 10 C 652, 2010 WL 2169493, at *5 (N.D. Ill. May 27, 2010). This Circuit has acknowledged that, under Illinois law, for a clause to be considered a no-reliance clause, and not an integration clause, it must explicitly disavow any "reliance." *Compare Vigortone*, 316 F.3d at 645 (stating absent a "reference to reliance," the clause at issue is a "standard integration clause," that does not bar a fraud claim) *with Rissman v. Rissman*, 213 F.3d 381, 383 (7th Cir. 2000) (holding that a clause that assured the plaintiff "had not relied on any prior oral statement" in making the transaction in dispute was a no-reliance clause) *and Aeroground*, 2010 WL 2169493, at *5 (a clause providing that "no party is relying on any statement or representation made hereto" is a no-reliance clause). Here, the Integration Clause does not abjure all "reliance," but is instead a standard integration clause that does not render Ward's reliance unreasonable as a matter of law. *See Vigortone*, 316 F.3d at 645.

### C.     Damages that Result from Reliance on a False Statement

Cecola's and Triumph's last contention in support of their motion to dismiss is two-fold. First, they aver that Ward has failed to adequately plead damages. Second, they argue that even if his damages allegations are sufficient, he failed to allege that his damages resulted directly from his reliance on Cecola's false statements. (Mem. in Support of Mot. to Dismiss at 9; Pl.'s Reply at 6).

In Illinois, "compensatory damages for fraud are intended to compensate for 'any injury which is the direct and natural consequence of [the plaintiff's] acting on the faith of defendant's

29

representations.'" *Roboserve Inc., v. Kato Kagaku Co., Ltd.*, 78 F.3d 266, 274 (7th Cir. 1996)

(quoting *Gold v. Dubish*, 193 Ill. App. 3d 339, 140 Ill. Dec. 9, 15, 549 N. E. 2d 660, 666 (Ill.

App. 5th Dist. 1989)).  Damages for fraud, however, "are not intended to restore what one never

had."  *Id*.  Therefore, for Ward's alleged injuries to survive Cecola's and Triumph's motion to

dismiss, he must allege actual injury.  *See Eckel v. Bynum*, 240 Ill. App. 3d 867, 879, 181 Ill.

Dec. 94, 608 N. E. 2d 167 (1st Dist. 1992).  Illinois law permits recovery for out-of-pocket

losses as a result of fraud if they directly result from the purported misrepresentation.

*Roboserve*, 78 F.3d at 274 (citing *Gold*, 193 Ill. App. 3d 229).

Ward alleges that he has been harmed as a result of his reliance on Cecola's false

statements "in that he should have been an equal partner with Cecola, should not have been

terminated from his employment, and should have been able to hold [Triumph's] shares without

them having a depreciated value due to Cecola's misappropriation of Triumph's monies."

(Countercl. ¶ 337.)  Ward fails to allege facts to support a reasonable inference that his

employment termination and the depreciated value of Triumph's shares resulted from his

reliance on Cecola's allegedly false statements.  Morever, the alleged depreciation in value to

Triumph's shares is a derivative injury, for which Ward lacks standing to recover.  *See supra*.

Ward's allegation that his reliance on Cecola's false statements deprived him of an equal

partnership in Triumph, however, provides a sufficient basis to reasonably infer, at this stage in

the litigation, that he suffered damage as a result of his reliance on Cecola's false statements.

*See AnchorBank*, 649 F.3d at 614 ("The issue [on a Rule 12(b)(6) motion] is not whether a

plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support

the claims.").  Indeed, pursuant to Ward's allegations, Cecola allegedly falsely told Ward that he

and Cecola were equal partners and had the same deal, and that Trovare was an independent group of investors. In reliance on those statements, Ward signed the employment agreement with Triumph. It is reasonable to infer that Ward suffered damage by not receiving the deal that Cecola allegedly represented to him. *See, e.g., Roboserve*, 78 F.3d at 274 (recognizing that in Illinois, benefit-of-the-bargain damages are recoverable in actions for fraud "where the transaction between the parties has actually been consummated based on the fraudulent misrepresentation") (quoting *Application of Busse*, 124 Ill. App. 3d 433, 79 Ill. Dec. 747, 464 N. E. 2d 651 (Ill. App. 1st Dist. 1984)); *Poeta v. Sheridan Point Shopping Plaza P'ship*, 195 Ill. App. 3d 852, 858, 552 N.E.2d 1248, 1252 (1990) ("a 'benefit-of-the-bargain' analysis for damages is appropriate in an action for fraud").

Triumph and Cecola argue that "Ward's theft from the company, and subsequent termination, would have forfeited any shareholder interest he could have received under the Employment Agreement." (Mem. in Supp. of Mot. to Dismiss at 9.) That argument, however, is not appropriate for a Rule 12(b)(6) motion to dismiss, at which stage the Court must accept as true all well-pleaded allegations and draw all reasonable inferences in the plaintiff's favor. *See AnchorBank,* 649 F.3d at 614. Accordingly, the Court denies Triumph and Cecola's motion to dismiss Ward's fraudulent inducement claim.

## V.     Conversion

To state a claim for conversion under Illinois law, Ward must allege that "(1) he has the right to the property; (2) he has an absolute and unconditional right to the immediate possession of the property; (3) he made a demand for possession; and (4) [Triumph and the Third-Party Defendants] wrongfully and without authorization assumed control, dominion, or ownership

31

over the property." *Cirrincione v. Johnson*, 184 Ill. 2d 109, 234 Ill. Dec. 455, 703 N. E. 2d 67,

70 (1998). Ward's allegations do not state a claim because he does not allege that he,

individually, has the right to any property–instead, he alleges that Triumph and the Third-Party

Defendants unlawfully converted *Triumph's* property for their own use. (Countercl. ¶¶ 375-

381.) Although Ward suggests in his opposition that Triumph and the Third-Party Defendants

converted his bonuses and "additional shares in the company," his assertions are not supported

by the allegations in his Counterclaim. Accordingly, the Court dismisses Ward's conversion

claim without prejudice.

## CONCLUSION

For the reasons set forth above, the Court grants Triumph's and the Third-Party

Defendants' motion to dismiss Counts II, III, IV, and V, but denies the motion as to Count I.

The Court dismisses Ward's derivative claims with prejudice and dismisses his individual claims

without prejudice. Ward may file an amended counterclaim on or before July 27, 2012.

**Date:** July 10, 2012

ENTERED

_____

AMY J. ST. EVE
United States District Court Judge